**Angeline OSTAPOWICZ,**
**Plaintiff-Appellee,**

v.

**JOHNSON BRONZE COMPANY,**
**Defendant-Appellant.**

**No. 75–2435.**

United States Court of Appeals,
Third Circuit.

Argued June 22, 1976.

Decided Aug. 27, 1976.

As Amended Sept. 29, 1976.

---

Jonathan L. Alder, C. Arthur Diamond, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for plaintiff-appellant.

Robert N. Hackett, Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, Pittsburgh, Pa., for defendant-appellee.

Abner W. Sibal, Gen. Counsel, Joseph T. Eddins, Jr., Assoc. Gen. Counsel, Washington, D. C., Beatrice Rosenberg, Charles L. Reischel, Mary-Helen Mautner, Attys., E. E. O. C., Washington, D. C., as amicus curiae for appellee.

## OPINION OF THE COURT

Before KALODNER, ADAMS and WEIS, Circuit Judges.

WEIS, Circuit Judge.

In a lengthy and stoutly contested class action, the district court turned aside a jurisdictional attack and determined that the defendant had been guilty of sex discrimination in its employment practices. The court ordered relief in the form of back pay and other measures designed to prevent future discrimination. Although we affirm in all other respects, the portion of the order establishing a hiring quota is vacated because of a lack of support in the record.[1]

The dispute centered on a contention that defendant Johnson Bronze Company had violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Plaintiffs argued that the defendant had engaged in discrimination which resulted in women being laid off while men with less seniority were either retained or recalled at an earlier date.

Defendant manufactured bushings and bearings in a plant organized into ten divisions. Approximately one-half of the hourly workers were employed in Division 1, the machine shop comprised of some 225 machine centers. Most of the testimony was devoted to conditions existing there.

Each machine operation generally requires a "set-up" which entails placing fixtures and tools in the machine at proper positions, angles and distances so that the bushings or bearings produced comply with exacting customer specifications. The ability to perform a "set-up" is an important factor in classifying a machine operator as first or second class. The first class operators set up the machines as well as operate them, but second class operators only run the machines, the set-up being performed by a machine setter. However, on occasion a machine setter will set up a first class operator's machine.

There were two means by which a second class operator could become first class: "bidding" or "bumping." In the former situation, if an opening for a first class operator occurred, employees could "bid" for the job, with seniority as the sole criterion. After a five-day qualifying period on the machine, the employee was required to demonstrate his ability to both set-up and operate the machine. In the latter, if an employee's job was eliminated, he could "bump" another employee who had less seniority and take his job. However, when a bump occurred, the bumping employee had to pass the test for becoming a first class operator immediately—no qualification period was allowed. Further, if, upon being

1. The opinion of the district court determining liability is reported at 369 F.Supp. 522 (W.D. Pa.1973).

laid off, an employee refused to bump a certain job, he could not be recalled to that position if an opening later occurred.

Qualification as a first class operator without experience was not possible. The company did not have a formal program for training second class operators to become first class, and an employee could only learn how to make the set-ups by watching machine setters, asking questions and attempting to do the work. The skills and experience an employee acquired working on one machine usually were not transferable to another mechanism. The machines were so diverse that one obtained the ability to become first class only on those which he had operated as a second class operator or which were related in their manner of operation.

The gravamen of Ostapowicz's allegations was that women were discriminated against because they were employed only as second class operators and were never promoted to first class. Although there was a slight difference in the wage scales for the two classifications, the major impact of the classification was felt when layoffs occurred. Under the collective bargaining agreement, the company was generally obliged to lay off second class operators before first class operators regardless of the individuals' seniority. Thus, a decline in business would affect a female before a male first class operator with far less seniority.

In April, 1968, the union which represented the employees filed a charge with the Equal Employment Opportunity Commission alleging that the company maintained sex-segregated job classifications which resulted in women being laid off while men with less seniority were both retained and recalled from layoffs before women. Attached to the charge, which was docketed at YCL9–079, was a grievance from a woman in the shipping department. The resulting investigation and EEOC findings were limited to the shipping department, and in August, 1970, the Commission found reasonable cause to believe that the allegations were true. Plaintiff Ostapowicz, who was not connected with the shipping department, filed two additional sex discrimination charges, TCL1–0558 and TCL1–0802, in October and November, 1970.

The EEOC conciliation efforts began in December, 1970 but were unsuccessful. On March 29, 1971 the Commission sent "right-to-sue letters" to Ostapowicz and others referring to charge YCL9–079. Based on that letter, she instituted this action on April 27, 1971, within the then applicable thirty-day period. Without further investigation, on May 11, 1971, EEOC issued additional letters citing the charges filed in October and November, 1970, and Ostapowicz promptly amended her complaint to include them.

The district court certified the case as a class action [2] and found that plaintiffs established a prima facie case of discrimination. Finding that strength was not a determinative factor for positions in either the shipping department or Division 1, the court concluded that the company was hostile to women who wanted to become first class operators or heavy packers and had intimidated them at least to a degree.

The court detected a pattern of intentional discrimination. In 1970 a man was made a mail clerk while many women with greater seniority were laid off. Women had never been employed in five of defendant's ten divisions, and in 1965 and 1966 sixty-five men were hired in Division 1 and only one woman. Because of the decline in business, there were few bids open for first class positions, and women had to rely mainly on bumping to achieve that classification. However, their progress was hindered because they had not been given the opportunity to observe difficult set-ups being made and were thus deprived of the primary means of acquiring the necessary skills. Moreover, the court found that the

2. We note that the definition of the class includes all past employees. On remand the district court should modify this determination so as to include only those whose claims were not time barred. *See Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 246 (3d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

first class test was subjective, not objective, and was administered entirely by men.

Out of an average of fifty women working in Division 1, only one had ever been made a first class operator although many had over twenty years' experience in the shop. Plaintiffs' statistical evidence showed that, because of the classification and recall systems, many women were laid off while men with less seniority remaining working.[3] Finally, machine setters, foremen and assistant foremen were recruited from first class operators and, therefore, women had been excluded from consideration for this additional advancement.

On these facts, the district court determined that the plaintiffs had established a prima facie case of discrimination. It rejected defendant's proffered justifications and ordered relief which included establishment of a training program administered by an outside agency; adjustment in seniority because of discriminatory layoffs; an affirmative action program including future hiring of males and females in equal numbers; and back pay. The last matter was referred to a magistrate for hearing and submission of findings of fact.

## I.

Defendant contends that the district court lacked jurisdiction because the first right to sue letter upon which Ostapowicz relied cited the EEOC docket number of a charge applicable only to employees in the shipping division. The company argues that since the plaintiff was not a member of that department, she was not "aggrieved" by any discrimination occurring there and could not "piggyback" her claim onto the first letter. While defendant's position has appeal, we cannot accept it in the circumstances of this case.

The Equal Employment Opportunity Act's format provides that after a person claiming to be aggrieved files a charge with the EEOC, the agency must notify the respondent and conduct an investigation. If, after the investigation, the Commission finds reasonable cause to believe that the charge is true, conciliation procedures are instituted. If the Commission is unable to resolve the matter informally, it notifies the aggrieved party of his right to file a civil action in the district court within ninety days.[4] 42 U.S.C. § 2000e–5.

The jurisdictional prerequisites to a suit under Title VII are the filing of charges with the EEOC and the receipt of the Commission's statutory notice of the right to sue. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). These preliminary steps are essential parts of the statutory plan, designed to correct discrimination through administrative conciliation and persuasion if possible, rather than by formal court action. While preliminary requirements for a Title VII action are to be interpreted in a nontechnical fashion, *Love v. Pullman Co.*, 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972); *Hackett v. McGuire Brothers, Inc.*, 445 F.2d 442 (3d Cir. 1971), the aggrieved person is not permitted to bypass the administrative process. Conciliation rather than formal court proceedings remains the preferred method of settling disputes. *Equal Emp. Op. Com'n v. E. I. duPont de Nemours & Co.*, 516 F.2d 1297 (3d Cir. 1975); *Fekete v. U. S. Steel Corp.*, 424 F.2d 331 (3d Cir. 1970).[5]

In order to comply with the spirit of the Act, there must be some limitation on suits in the district court so that the Commission will have the first opportunity to examine the allegations of discrimination. Courts have generally determined that the parameters of the civil action in the district court are defined by the scope of the EEOC in-

---

3. The district court found, for example, that on May 25, 1971 there were twenty-six male first class operators who were junior in seniority to Ostapowicz working while she was laid off.

4. At the time suit was filed, the relevant period was thirty days.

5. *See also* the Conference Report on the Equal Employment Opportunity Act of 1972, 118 Cong.Rec. 7166, 7168 (1972).

vestigation which can reasonably be expected to grow out of the charge of discrimination, *Gamble v. Birmingham Southern R.R. Co.*, 514 F.2d 678 (5th Cir. 1975); *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970), including new acts which occurred during the pendency of proceedings before the Commission, *Oubichon v. North American Rockwell Corp.*, 482 F.2d 569 (9th Cir. 1973).[6]

▇ The original charge, YCL9–079, filed by the union on April 11, 1968, alleged that the employer had discriminated against female members of the bargaining unit. The grievance attached referred only to the shipping department, and the EEOC report of August, 1970 similarly was confined to that division. If this had marked the end of the EEOC's involvement, there would be some force to the defendant's contention that Ostapowicz could not bring herself within the scope of the EEOC charge and subsequent suit letter. However, the additional charges of sex discrimination filed by her in October and November, 1970, numbered TCL1–0558 and TCL1–0802, implicated the seniority rights of women in the machine shop division where she worked. It was after the filing of these additional charges that conciliation discussions and proposals took place between the Commission and the employer.

On March 19, 1971, after EEOC's settlement efforts had failed, it received a letter from Ostapowicz stating her desire, and that of other female employees, to sue the employer. She referred to charge YCL9–079, said she had testified in that case, and had also filed cases TCL1–0558 and TCL1–0802. The first right to sue letter was issued ten days later. Thus, before suit was instituted and before EEOC's role had been terminated, three separate charges had been filed, each alleging specific instances of the same form of sex discrimination by the same employer. The additional charges filed during the pendency of the administrative proceedings may fairly be considered explanations of the original charge and growing out of it.[7] Under these circumstances, we cannot say that the district court erred in concluding that it had jurisdiction over the suit as originally filed and that it encompassed all the instances of sex discrimination. *See Gamble v. Birmingham Southern R.R. Co., supra. Cf. E.E.O.C. v. General Electric Co.*, 532 F.2d 359 (4th Cir. 1976).

## II.

The defendant contends that the district court erred in allocating the burden of proof and argues that plaintiff failed to prove sex discrimination or to rebut the company's articulated justifications. After careful review of the district court's opinion incorporating findings of fact and conclusions of law, we do not find reversible error.

The court cited *McDonnell Douglas Corp. v. Green, supra,* and carefully followed its guidelines in ruling on burden of proof at various stages of the case. The *McDonnell* case holds that once a prima facie case of a Title VII violation has been established, the burden shifts to the defendant to articulate legitimate nondiscriminatory reasons for the unequal treatment shown in the prima facie case. The defendant must prove its justification by a preponderance of the evidence. *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *United States v. International Union of Elevator Constructors,* 538 F.2d 1012, (3d Cir. 1976). *See also Wetzel v. Liberty Mutual Ins. Co.,* 508 F.2d 239, 259 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975)."

---

6. Although EEOC must be given the opportunity, it is not necessary that it actually investigate and conciliate a charge before a right to sue letter is issued. *Fekete v. U.S. Steel Corp., supra* ; Belton, Title VII of the Civil Rights Act of 1964: A Decade of Private Enforcement and Judicial Developments, 20 St. Louis U.L.J. 225 (1976).

7. The mere fact that the Commission assigned differing docket numbers to the various charges has no real significance since they all related to the same general charge originally filed.

■ The district court held that the plaintiff had established a prima facie case of discrimination by the use of statistical evidence and other testimony. The judge included in his findings that:

"A woman who desired to become first class was told by the personnel manager that she 'couldn't get it even if' she bid and that she couldn't have it. Plaintiff Ostapowicz was told it was foolish to try to qualify on a certain machine despite four years experience."

and that:

"A foreman in the shipping department stated he would 'take every girl machine operator in the shipping department off and replace them with men' if a woman became a heavy packer."

■ After the plaintiff had made out a prima facie case, the burden of proof then shifted to the defendant. The company then argued that women lacked interest in becoming first class operators. The district judge rejected this testimony, and wrote: "The court frankly in the light of all the testimony in the case does not believe the disclaimers of lack of intent to discriminate." After summarizing the evidence, he concluded, "This court has no hesitation in finding that there has been intentional discrimination at defendant's plant."

■ The findings of fact which support these conclusions must be shown to be clearly erroneous in order to be overturned. Fed.R.Civ.P. 52(a). As we stated in *Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d Cir. 1972):

" 'In reviewing the decision of the District Court, our responsibility is not to substitute findings we could have made had we been the fact-finding tribunal; our sole function is to review the record to determine whether the findings of the District Court were clearly erroneous, i. e., whether we are "left with a definite

and firm conviction that a mistake has been committed." ' "

*See also Government of Virgin Islands v. Gereau*, 523 F.2d 140 (3d Cir. 1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976). Defendant has not met this burden and the imposition of liability will be affirmed.

## III.

As part of the relief which he felt to be necessary, the district judge awarded back pay and referred that phase to a United States Magistrate who held several hearings. This part of the case proved to be complicated for two reasons: the claims were based upon deprivations of opportunities to acquire skills on diverse jobs and thus secure promotions to better paying positions; and, during the years in question, there had been numerous strikes and layoffs because of economic conditions.

■ Absolute precision in ascertaining plaintiffs' loss under such circumstances cannot be expected: the court must make reasonable awards based on the available data. *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211 (5th Cir. 1974). Here, the district judge determined that the period for computing the back pay award would begin two years before the date on which the first charge was filed,[8] making the starting date April 18, 1966. The award was composed of three elements: (1) the wage differential between first and second class operators for the periods during which plaintiffs worked; (2) wages lost through discriminatory layoffs; and (3) an amount representing lost fringe benefits.

The court determined that, based on seniority, the women who had worked as machine operators would all have been promoted to first class status by April 18, 1966, had discrimination not occurred.[9] The first

---

8. Because we have previously determined that the charge filed in 1968 encompassed all phases of discrimination, even those revealed by later charges, we agree that the 1966 date was correct. Although the amendments to the Act passed in 1972, of course, were not in effect at the time the discrimination occurred, we believe the court's utilization of that period was proper under the circumstances.

9. *See Gamble v. Birmingham Southern R.R. Co.*, 514 F.2d 678, 686 (5th Cir. 1975); *Bing v. Roadway Express, Inc.*, 485 F.2d 441, 453 (5th Cir. 1973).

portion of the award was measured by the difference between the average weekly wage for first class operators and that actually received by the individual plaintiffs. However, the amount attributable to discriminatory layoffs was not as easy to compute.

The company's business declined during the years in question and many employees were laid off for nondiscriminatory reasons. The magistrate had to determine which of the individual layoffs were due to discrimination and which were due to purely economic forces. It was extremely unlikely that anyone could ever qualify as a first class operator on each of the 200 different machines, but some of them were so similar in operation that experience on one would allow easy transition to another. For example, the operation of a small drilling machine might be quite similar to another larger drill, but both would be quite dissimilar to a chamfer machine. To make appropriate adjustments, the magistrate determined that the company's machines could be grouped into ten classifications. Utilizing these categories, she considered a woman discriminatorily laid off during the time a male with less seniority was working as a first class operator and plaintiff had experience on his or a related machine. Further a plaintiff was discriminatorily laid off if a male with less seniority was working on a replaceable job or as a mail clerk or chauffeur, unless the plaintiff had been offered that position. On the assumption that no employment was available at a time when a male junior to a woman was not working as a first class operator, allowances were thus made for the numerous nondiscriminatory layoffs which occurred. The award included curring).

From the above sums were deducted: (1) amounts which a plaintiff could have reasonably earned during layoff periods or which were actually earned or received from unemployment compensation and (2) allowances for periods when a plaintiff was unemployable because of illness.

■ We do not find the composition· of the formula or its application to be erroneous. It represents a conscientious effort to calculate reasonable and equitable awards under conditions which do not allow for absolute precision.

Among the remedies the court ordered was a provision that the company institute a training program administered by an outside firm to assist women in becoming first class machine operators, machine setters (the next higher category of skilled labor), and foremen. In addition, the defendant was required to submit periodic reports on affirmative action to plaintiffs' counsel and to establish a three member board as assurance against discrimination in future operations. The court also ordered "that any hiring in the future shall be in equal numbers of males and females."

Defendant strongly objects to the imposition of this open-ended hiring quota. We need not consider at length the troublesome question of reverse discrimination, *DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), and the language of Title VII, §§ 703–706, see *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *United States v. International Union of Elevator Constructors, supra,*[10] because the record contains no support for this sweeping order.

■ A district court is granted wide discretion in formulating corrective measures for discriminatory conduct. *Franks v. Bowman Transportation Co., supra,* but the basis for its actions must be expressed to allow effective review. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The order for a hiring quota does not pass muster because the court did not articulate factual findings and its reasons for this action.

---

10. *See also Equal Employment Opportunity Commission v. Local 638,* 532 F.2d 821 (2d Cir. 1976); *Rios v. Enterprise Assn. of Steamfitters Local 638,* 501 F.2d 622 (2d Cir. 1974); *Morrow v. Crisler,* 491 F.2d 1053 (5th Cir.), cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974); *cf. Patterson v. American Tobacco Co.,* 535 F.2d 257, 274 (4th Cir. 1976). DeFunis Symposium, 75 Colum.L.Rev. 483 (1975).

Quotas are an extreme form of relief and, while this court has declined to disapprove their use in narrow and carefully limited situations, *United States v. International Union of Elevator Constructors, supra; Erie Human Relations Commission v. Tullio,* 493 F.2d 371 (3d Cir. 1974), certainly that remedy has not been greeted with enthusiasm. *Pennsylvania v. O'Neill,* 473 F.2d 1029 (3d Cir. 1973).[11] The order in this case is open-ended in that it specifies no expiration date and applies across-the-board to all employees and all departments of the defendant company.

While it may be presumed that approximately half the population in a given area is female, that does not justify the conclusion that the available work force presents a similar ratio. No evidence on this point was introduced in the district court. Moreover, the court made no findings of whether females were qualified in all departments of the defendant's plant nor did it state whether the quota applied to each department or the company as a whole. Factual findings of this nature are vital, for in some respects there are significant differences in cases involving racial, as contrasted with sexual, discrimination, *see* 42 U.S.C. § 2000e–2(e)(1); 29 C.F.R. § 1604.2 (bona fide occupational qualifications based on sex, but not race, are permissible), and precedents from one area may not be freely interchangeable with those of the other. *Cf. Vorchheimer v. School Dist. of Philadelphia,* 532 F.2d 880 (3d Cir. 1976). Since these crucial factors have not been established in the record, this portion of the district court's order must be vacated.

Moreover, the district court's creation of a supervisory committee to oversee compliance with nondiscriminatory practices appears to be an effective method to prevent future discrimination while at the same time permitting employment to be based on ability and availability. Because of the absence of support in the record for the hiring

quota, we will vacate that portion of the district court's order. In all other respects, the judgment of the district court will be affirmed.

---

11. For a discussion of the philosophical and practical difficulties inherent in the use of quotas, *see* Blumrosen, Quotas, Common Sense and Law in Labor Relations: Three Dimensions of Equal Opportunity, 27 Rutgers L.Rev. 675 (1974). *See also* Sape, The Use of Numerical Quotas to Achieve Integration in Employment, 16 Wm. & Mary L.Rev. 481 (1975); Note, Race Quotas, 8 Harv.Civ.Rights-Civ.Lib.L.Rev. 128 (1973).