**Biruta CAP**

v.

**LEHIGH UNIVERSITY.**

**Civ. A. No. 76–1846.**

United States District Court, E. D. Pennsylvania.

April 7, 1978.

See also D.C., 433 F.Supp. 1275.

Gordon Gelfond, Philadelphia, Pa., for plaintiff.

J. Freedley Hunsicker, Jr., Philadelphia, Pa., for defendant.

MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

This sex discrimination case, brought under Title VII of the Civil Rights Act of 1964, was tried before the Court, sitting without a jury, from February 27 to March 2, 1978. Closing arguments were heard on March 7, 1978. The parties filed with the Court proposed findings of fact and conclusions of law, and the matter is now ready for decision.

The plaintiff, Biruta Cap, Ph.D., a former assistant professor of French language and literature at Lehigh University, asserted in this action that the defendant, Lehigh University, discriminated against her on the basis of her sex when it decided to deny her tenure in April 1973. Specifically, the plaintiff alleged that she was qualified for tenure, that Lehigh had no valid reason not to grant it, and that its decision was based on her sex. The University's response was that the plaintiff was not sufficiently qualified for a tenured position in its Depart-

ment of Modern Foreign Languages, and that the University's decision to deny her tenure was not based on the plaintiff's sex. For the reasons hereinafter set forth, the Court will enter a judgment for the defendant, Lehigh University, and against the plaintiff, Biruta Cap.

At trial, the defendant renewed its motion to dismiss for lack of subject matter jurisdiction on the ground that the plaintiff did not file a timely charge with the Equal Employment Opportunity Commission, as required by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* In a memorandum dated June 3, 1977, this Court dismissed a similar motion on the basis of the facts therein considered. Since this is a motion pursuant to Federal Rule of Civil Procedure 12(b)(1), however, it may be renewed at any time during the course of the litigation.

In our memorandum of June 3, 1977, we concluded that "the alleged discrimination continued at least until the plaintiff was informed that her case had been reviewed and the negative tenure decision affirmed." Having had the opportunity to hear the testimony at trial, we are convinced that our initial conclusion should remain unchanged. At trial, members of the Lehigh University administration testified that the reevaluation was intended to be a full and complete review as to tenure. It was also testified that the University monitored the plaintiff's performance during her terminal year to determine whether the proper decision had been made. Thus, the tenure denial at Lehigh did not become final until after the reevaluation had been completed. We therefore conclude that the charge was filed within the 180 day period after the alleged unemployment practice occurred. The defendant's motion to dismiss shall be denied.

The parties stipulated to many of the facts involved in this litigation. The plaintiff received a Bachelor's degree from the University of Connecticut in 1960. She received her Master's degree from Rutgers University in one year, and completed her Ph.D. coursework in two years. In 1963 she took a full-time teaching position at Dunbarton College, where she remained for five years, until she completed her thesis on the works of Moliere, a French dramatist. At Dunbarton, the plaintiff was an instructor for the first three years, and an assistant professor during the last two. After receiving her Ph.D. in 1968, the plaintiff accepted a position at East Stroudsburg State College for one year as an assistant professor, and then joined the Department of Romance Languages and Literature at Lehigh University.

According to Lehigh University's Procedures, Rules and Regulations (hereinafter "PR&R") adopted in 1970, a review of Dr. Cap's credentials and performance was to be conducted during the year 1971–72 in order to determine whether she should be granted tenure. The procedure used at Lehigh for making decisions regarding promotion and tenure is initiated by the chairman of the faculty member's department. The chairman solicits the written opinions of the tenured faculty members in the department on the candidate's (1) teaching, (2) research and scholarship, and (3) service to the University. If the department's recommendation is favorable, then the University convenes a three member ad hoc advisory committee to review the scholarship of the candidate. The recommendation of the department plus the ad hoc committee letters are sent to the Dean who then makes a recommendation to the Provost, whose recommendation in turn goes to the President. The Trustees approve positive recommendations for promotion and tenure.

It was established at trial that Dr. Van Eerde, the Chairman of the Department of Romance Languages, initiated the tenure evaluation process for the plaintiff and that he and the only other tenured member of the Department, Dr. Victor M. Valenzuela, both wrote letters on her behalf. Such letters written by the tenured faculty, according to the PR&R, are to address themselves to an evaluation of the candidate's accomplishments in the three areas enumerated above. However, since no one had been recommended for tenure in the De-

partment of Romance Languages for many years, Dr. Van Eerde was apparently unfamiliar with the procedures required by the PR&R, and did not request that Dr. Valenzuela review Dr. Cap's work or write on these specific points. In fact, the letter Dr. Valenzuela sent in stated "In all honesty, I have never . . . read material (articles or books) written by her regarding her field of teaching." The PR&R also provides that "in departments with few tenured faculty . . . the department chairman shall consult the tenured faculties of closely related departments" for their opinions with respect to whether tenure should be granted. PR&R 1.3.07.01. This was not done in Dr. Cap's case.

The evaluations submitted by the two tenured members of the Romance Languages Department were transmitted to Dr. Ross Yates, the Dean of the College of Arts and Sciences. Dean Yates wrote to an ad hoc committee composed of three French scholars not on the Lehigh faculty, asking each whether he would recommend Dr. Cap for tenure. They replied in the affirmative. Although it was the Dean's responsibility to see that the proper procedure had been followed in tenure evaluations conducted in the College of Arts and Sciences, Dean Yates did not require adherence to the procedures of the PR&R. Upon receipt of the ad hoc committee members' letters, he sent all the opinions he had received to the Provost, Dr. Zettlemoyer, with his recommendation that the University not offer tenure to the plaintiff because her case was weak. Provost Zettlemoyer concurred in the Dean's evaluation, so in May 1972 the plaintiff was given a one year terminal contract.

Plaintiff had expected to receive tenure because she thought she had favorable recommendations from the two tenured faculty members of her department. When she found out in early February 1972 that she might be given a terminal contract, both she and Dr. Van Eerde requested that Dean Yates consider her application for tenure withdrawn, so that she could be evaluated the following year. The Dean informed each of them, however, that she could not be reviewed for tenure after 1972.

After the determination to deny the plaintiff tenure was finalized in May 1972, she requested a meeting with Dr. John Hunt, who had replaced Dr. Yates as Dean of the College of Arts and Sciences in July 1972. The plaintiff asked him to grant her a year's extension and then conduct another tenure evaluation because (1) it was unfair to look at her record after only three and a half post-doctoral years when under the rules others could have up to five and a half post-doctoral years to do research before evaluation, and (2) her research and service to the University had been slowed down because of the birth of her child in April 1971, and therefore she had not had an opportunity to make the extra effort normally exerted by tenure candidates in the review year. As Dr. Hunt was not familiar with the situation, he told her that he would look into the matter. Soon afterwards, he informed her that the PR&R did not permit Lehigh to give her an extra year, and that the University would be open to censure by the American Association of University Professors ("AAUP"), if it granted her an extension.

The plaintiff appealed the decision denying her an extension and the adverse tenure determination to Committee W of the AAUP at Lehigh and to the Lehigh University Personnel Committee. Committee W is an advisory or watchdog organization which was formed to consider complaints of sex discrimination. The Personnel Committee is an official part of the University, with authority to hear complaints concerning the procedural aspects of tenure determinations. Committee W found that there had been no sex discrimination involved in the plaintiff's case. It did recommend, however, that she be granted an extension of one year because of her child care responsibilities. The Personnel Committee contacted the AAUP to determine if the administration was correct in its belief that Lehigh would be censured if it granted the plaintiff a one year extension. The AAUP responded:

In the case of Professor Cap, it seems clear that a postponement of a tenure

decision may well be in order . . . . . Justification [for deferral], if it exists, derives from Professor Cap's special family responsibilities during the probationary period, and we recommend that on this ground the Personnel Committee and administration consider the advisability of a postponement.

The Personnel Committee also conducted an independent investigation into the tenure review that had been done in the plaintiff's case and in December 1972 sent the following recommendations to the administration:

The Personnel Committee strongly and unanimously recommends that Dr. Cap be given a complete and thorough reevaluation regarding tenure. This reevaluation should be made by (1) the Department of Modern Foreign Languages, and possibly other members of the Lehigh faculty, (2) an acceptable ad hoc committee, (3) Dean Hunt, and (4) Provost Zettlemoyer. The Committee would like to emphasize its complete neutrality in the eventual decision. The basic reason for the recommendation is to assure that a fair appraisal is made according to due process.

With this recommendation, Dr. Cap would be granted a one-year contract for the academic year 1973–4. This contract should contain a clause which states that the two years at Dunbarton College will not be included in the probationary period. The evaluation of Dr. Cap can then be made at any time up until 31 August 1974, without granting tenure automatically.

The administration did not accept either recommendation. On March 6, 1973 the Personnel Committee reiterated its position in a letter to Dr. W. Deming Lewis, President of the University:

Our thorough and protracted investigation of this case has convinced us that there were, indeed, special factors which resulted in a less than full appraisal of Dr. Cap's scholarship, teaching ability, and service to the University. Further, taken together, the Committee's February 13 letter to Joseph Schwartz of the AAUP and Schwartz's response dispel

concern that the granting of an additional year to Dr. Cap would result in automatic tenure . . .

For these reasons, we hereby petition the Administration to grant an additional one-year contract to Dr. Cap, with the stipulation that this in no way implies the granting of continuous tenure. During this period, she should be evaluated for possible promotion by the tenured members of the Modern Foreign Languages Department, and others, in accordance with the appropriate provisions of PR&R 1.3.10.01.

On March 10, 1973, members of the administration and the Personnel Committee met to discuss the matter and an agreement was reached on March 13 that the plaintiff would not be given a year's extension, but the administration would conduct a tenure reevaluation. In the interim between the first and second evaluation of the plaintiff, the Departments of Romance Languages and Literature and German and Russian had been merged to form the Department of Modern Foreign Languages. Dean Hunt served as chairman of the reevaluation committee, the other members of which were the tenured members of the new Department: Dr. Herz (Russian); Dr. Ubben (German); Dr. Van Eerde (French); Dr. Valenzuela (Spanish); and Dr. Gardner (German). On March 13, when Lehigh agreed to reevaluate the plaintiff for tenure, Dean Hunt called together the members of the committee, and asked each of them to give him "in writing a current evaluation of the appropriateness of advancing the plaintiff to the position of associate professor with tenure." The Dean directed their attention to the preamble of 1.3.07.01 of the PR&R, which states that the three criteria for tenure at Lehigh are effective teaching, sound research and scholarship and service to the University. He asked that the letters of evaluation respond to these criteria. The Dean also provided the tenured department members with copies of the plaintiff's published works.

Within two weeks Dean Hunt received recommendations from each member of the

committee. Each letter contained a review of the plaintiff's performance with respect to the three tenure criteria. Drs. Herz, Ubben and Valenzuela concluded in their letters that, on the basis of their independent evaluations, the plaintiff should not be granted tenure, while Drs. Van Eerde and Gardner recommended that she be given tenure. On April 2, 1973, Dean Hunt transmitted the results of the review to the Provost with his recommendation against tenure. In his letter to the Provost, Dean Hunt stated:

> As I sort through the evidence of Dr. Cap's teaching ability, scholarship, and service to the University presented in her *curriculum vitae* and accompanying material and evaluated by the five letters from tenured members of the department, I find serious questions arising in all categories. Drs. Gardner and Van Eerde praise her teaching . . . . Yet there is testimony and evidence from the others [to the contrary] . . . .
>
> One also gets an uneasy feeling about the scholarship and university service which those who support Dr. Cap point to as constituting her strength. Although the number of printed pieces has gone up slightly during the last year, their quality does not appear to be sufficiently great (see Dr. Valenzuela's letter) to count them as compelling evidence.

A copy of Dean Hunt's recommendation and supporting documents were sent to the Personnel Committee. On April 10, 1973, the Committee wrote to Dr. Lewis, the President of the University, that, in its view, the Dean's recommendation based on the opinions written by the tenured faculty members was justified, and that due process had been followed. The next day Dr. Lewis wrote to the plaintiff informing her that her terminal contract would not be renewed.

The plaintiff testified at trial with respect to her activities while at Lehigh. She explained that she had introduced six graduate level courses, ranging in subject matter from medieval to contemporary French literature, and that she gave several public lectures in the area of her expertise. Between 1969 and 1973 she wrote two articles and one book review which appeared in well known scholarly publications. In addition, she had prepared a book manuscript on Moliere, which was based on her Ph.D. dissertation. This was being considered for publication by the University of Alabama Press in 1973. The plaintiff testified that she was a member of the Foreign Study Committee at Lehigh, an advisor to the French Club, and had directed the Lehigh summer study program in Paris, France in 1971.

The plaintiff also explained that she gave birth to a son in April 1971, but that she did not take an extended period of leave at that time, since there was no provision for maternity leave in the PR&R, and she did not wish to call attention to her pregnancy by making a special request. The plaintiff stated that the effect of her maternity was that in 1971–1972 she could not take on new research or service projects, although she did continue with her existing work. She stated that because of the birth of her child in the spring of 1971, she was precluded from making the extra "push" toward publication and service to the University in her tenure review year that other assistant professors were able to do.

In evaluating the attitude of the tenured members of the Modern Foreign Languages Department, the plaintiff stated that Dr. Herz, although a woman, was prejudiced against her on the basis of sex because Dr. Herz thought the plaintiff should have stayed at home with her child, rather than continuing to work at the University. The plaintiff pointed out that Dr. Herz never recommended a woman for tenure while at Lehigh. Since Dr. Herz was Department Chairman, the plaintiff felt that she had influenced Drs. Ubben and Valenzuela to oppose her tenure request, and that because of Dr. Herz's position in the Department, Dean Hunt had given great weight to her opinion in forming his own negative tenure recommendation. The plaintiff noted that Dr. Van Eerde, her Department Chairman for three out of her four years at Lehigh and the only tenured Department member

in her field, and Dr. Gardner, the teacher with whom she shared her office, were the professors in the best position to evaluate her work, and that they both recommended tenure.

Finally, the plaintiff testified that despite her maternity related problems, she felt that her record compared favorably with that of Dr. Alexander Waldenrath, a German teacher who was granted tenure at Lehigh in 1974, although he had received a negative recommendation by the tenured members of the Department of Modern Foreign Languages. The plaintiff stated that she thought their teaching abilities were comparable, and that, although Dr. Waldenrath had twelve articles in print or accepted for publication, all his research had been done on the German-American culture in the Lehigh Valley, which in her view was a narrow research area for a German scholar. She also stated that most of Dr. Waldenrath's work had been published in small local publications, rather than in the well recognized journals in which her work had appeared. With respect to service to the University, the plaintiff stated that both she and Dr. Waldenrath were active in University affairs, and that the only difference between them was that she had not been appointed or elected to any of the University's twenty-two committees, while Dr. Waldenrath had. She explained, however, that only one woman at Lehigh had attained membership on such a committee in the years she was there.

The plaintiff called Provost Zettlemoyer as on cross-examination, and offered into evidence the depositions of Dr. Ferdinand Beer and Dr. Laura Liss. The Provost testified that if the plaintiff had been granted a one-year extension, Lehigh would have risked a claim that she had received *de facto* tenure.

Dr. Beer's deposition stated that he is a Frenchman, and for twenty years was chairman of the Department of Mechanics at Lehigh. On three occasions, he was elected President of the Lehigh Chapter of the AAUP. He stated that he called Dr. Zettlemoyer in 1972 to tell him that although he did not want to interfere with the Department of Modern Foreign Languages' tenure decisions, as the only French native on the faculty he thought that it was proper for him to call the Provost and point out that he felt the plaintiff spoke French like a French native. Dr. Beer also stated that the Provost told him that the reason the plaintiff had been given a terminal contract was that during the formation of the Department of Modern Foreign Languages, she had "backed the wrong horse" by supporting Dr. Van Eerde as Department Chairman instead of Dr. Herz.

Dr. Laura Liss, in her deposition, testified that she was Lehigh's Affirmative Action Officer for three and a half years, starting in 1974. Although the defendant has objected to her testimony, the Court has accepted the relevant portions into evidence. The Court has considered her opinions and has given them the weight which we think they deserve in light of her credentials and the period of her observations. Dr. Liss testified that she had great difficulty convincing Lehigh to accept an appropriate affirmative action plan, and that a plan was not adopted until April 1976. She described the downgrading of her position as Affirmative Action Officer during her three and a half years at Lehigh. She testified as to the number of women and their positions at Lehigh as compared to the number of men and their positions. She also stated her recollection of various sex biased comments and actions by Dr. Zettlemoyer, Dr. Lewis, Dr. Hunt and several other Lehigh administrators.

The defendant presented seven witnesses: Dr. Hunt, Dr. Herz, Dr. Valenzuela, Provost Zettlemoyer, Dr. DiAngeli, President Lewis and Gary Lutz. Dr. Hunt described the tenure review procedure within the College of Arts and Sciences, and the reevaluation process used in the plaintiff's case. He stated that in evaluating the plaintiff for tenure, he had tried to be impartial. He also compared the plaintiff's record at Lehigh with Dr. Waldenrath's and concluded that Dr. Waldenrath was more qualified for tenure because he had a more extensive list

of publications and was more active in campus affairs.

Dr. DiAngeli testified that she had been Chairman of Committee W of Lehigh AAUP in 1972–1973, and that Committee W at that time was comprised of women plus one man. She explained that the function of Committee W was to ascertain whether there was discrimination as to sex at Lehigh. As heretofore set forth, Committee W found that there had been no sex discrimination in the plaintiff's case.

Dr. Valenzuela stated that he recommended the plaintiff be denied tenure in 1973 after evaluating her record according to the three criteria. He also testified that he felt that Dr. Waldenrath was more qualified for promotion on the basis of his scholarship and service to the University.

Dr. Herz testified that she had received several complaints from students about the plaintiff's insensitivity to students' problems, and that the plaintiff did not make herself available to students outside of class. She stated that her recommendation was based on her evaluation of the plaintiff's record according to the three tenure criteria. In comparing the plaintiff with Dr. Waldenrath, Dr. Herz stated that Dr. Waldenrath was more committed to teaching and a better scholar. She denied any bias against the plaintiff because of her sex or because she had a young child.

Dr. Zettlemoyer testified that he thought the plaintiff had shown little evidence of scholarship and had given little service to Lehigh. He confirmed Dr. Liss's statement that Lehigh did not adopt its first affirmative action program until April 1976, and said that the University had made less progress that he would have liked in this area. He stated that Lehigh did not become co-educational in its undergraduate school until 1971. At present its admission quota for females in the undergraduate school is 20%.

President Lewis testified that in evaluating the plaintiff's case, he relied upon the recommendations of the department members, the Dean and the ad hoc committee.

Gary Lutz, who testified as an expert on the interpretation of statistics, was presented with two studies and asked whether he could draw any conclusion concerning sex discrimination from them. One study showed that in the College of Arts and Sciences since 1971, three women have been granted tenure out of the six that have been considered. The second study showed that in that College and during that same period of time, thirty-four men received tenure out of fifty-six men who were considered for tenure. He testified that in his opinion as an expert, one could not draw any conclusion from such statistics concerning sex discrimination.

This case is brought under Title VII of the Civil Rights Act of 1964. The plaintiff claims that the defendant, an employer, treated her less favorably than others because of her sex. In *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), the United States Supreme Court set out the order and allocation of proof in private, non-class action discrimination cases:

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. . . .
>
> The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. . . .
>
> [If this is done, then the plaintiff must] be afforded a fair opportunity to show that [the defendant's] stated reason for his rejection was in fact pretext. Especially relevant to such a showing would be evidence that white employees involved in acts against the employer of

comparable seriousness . . . were nevertheless retained. . . .

Other evidence that may be relevant to any showing of pretext includes facts as to the petitioner's treatment of respondent during his prior term of employment; petitioner's reaction, if any, to respondent's legitimate . . . activities; and petitioner's general policy and practice with respect to minority employment. On the latter point, statistics as to petitioner's employment policy and practice may be helpful to a determination of whether petitioner's refusal to rehire respondent in this case conformed to a general pattern of discrimination against blacks.

See also, International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

In this case, the plaintiff was seeking tenure at the defendant University, and tenure would have provided her with a long-term commitment on the faculty. Courts have somewhat modified the McDonnell Douglas rules with respect to what a plaintiff in a tenure case must show in order to establish a prima facie case. Huang v. College of Holy Cross, 436 F.Supp. 639, 653 (D.Mass.1977). In this case it is clear that the plaintiff, a woman, is a member of a class protected by Title VII. The plaintiff presented evidence designed to show that she was qualified for tenure in the Department of Modern Foreign Languages by comparing her qualifications with those of a German teacher named Alexander Waldenrath, Ph.D., who was granted tenure in the same department in 1974. She also testified that she was denied tenure. The plaintiff therefore carried her initial burden of establishing a prima facie case of sex discrimination.

Our Third Circuit in Rodriguez v. Taylor, 569 F.2d 1231, 1238–1239 (3d Cir. 1977) recently commented as follows on the burden of the parties in a Title VII case:[1]

In order to establish an employer's liability, Title VII plaintiff's, as an initial matter, need only present a prima facie case of employment discrimination. Plaintiffs satisfy their burden of production if they show that they are members of a protected class and that they were rejected for job vacancies for which they were qualified. Plaintiffs need not submit proof that a discriminatory motive underlay an employer's decisions. The burden of production then shifts to the defendant to adduce evidence of non-discriminatory motivation. See, McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 399–400 (3d Cir. 1976); Baxter v. Savannah Sugar Refining Corp., 495 F.2d 437, 443–45 (5th Cir.), cert. denied, 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974). Absent such rebuttal evidence, courts presume unlawful discriminatory purpose. Moreover, if an employer produces evidence of a non-discriminatory reason for an employment decision, he may bear the burden of persuasion on that ultimate issue.[14] Thus, under Title VII the courts have developed a set of shifting evidentiary burdens and presumptions that facilitates proof of employer's liability. See Intna'l B'hood of Teamsters v. United States, 431 U.S. 324, 357–62 & nn. 44–46, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

[14] The majority of circuits have construed the Green case as shifting the burden of persuasion to the defendant employer once a plaintiff presents a prima facie case of employment discrimination. (citations omitted).

On the basis of the evidence presented by the defendant in this case, the Court finds from a preponderance of the evidence that the defendant did not discriminate against the plaintiff on the basis of her sex.[2]

1. As Judge Huyett has pointed out in Rivers v. Westinghouse Electric Corp., 451 F.Supp. 44 at 48 n. 1 (E.D.Pa. 1978), the language in Rodriguez has not made it clear whether McDonnell Douglas has shifted some of the burden of persuasion to a defendant in a Title VII case.

2. The plaintiff also contended that the University discriminated against her on the basis of her sex when it denied her request for a one

The court finds that the defendant denied tenure to the plaintiff on the ground that her qualifications did not measure up to its standards for tenure. The defendant did not treat the plaintiff differently than similarly situated men. The conclusions of the tenured department members and of the University administrators who voted to deny the plaintiff tenure were based on their evaluations of her qualifications in accordance with the three criteria used to evaluate tenure candidates at Lehigh. In comparing the plaintiff's qualifications with those of Dr. Waldenrath, we find there was ample basis for the determination that he was more qualified for tenure.

Both the plaintiff and Dr. Waldenrath were good, respected and hardworking teachers. In the area of service to the University, the testimony showed that Dr. Waldenrath was slightly more active in University affairs than the plaintiff. With respect to research and scholarship, however, there was a difference. At the time Dr. Waldenrath was in his tenure review year, he had twelve articles and several book reviews in print or accepted for publication, while in the plaintiff's last year at Lehigh, she had only two articles and one book review published or accepted for publication. Although the plaintiff had been working on the manuscript for a book while at Lehigh, it had not been accepted for publication, and, according to the accepted standards at Lehigh, it was not considered to be a "publication" for tenure review purposes. Although the plaintiff testified that the quality of her scholarship was better than Dr. Waldenrath's, it is not for the Court to make such an independent evaluation. The issue before the Court was whether the plaintiff was denied tenure because of sex bias and the Court finds that, based on all the evidence presented in this case, the defendant's evaluation of plaintiff's teaching, research and scholarship and service was done in good faith and in accordance with Lehigh's standards for evaluating tenure. The Court also finds

that the plaintiff's claim was not frivolous, unreasonable or groundless.

The plaintiff in this case is an intelligent woman with outstanding abilities in her field of French language and literature. The denial of tenure by Lehigh University is not the end of her career. As Chancellor Posvar testified in *Johnson v. University of Pittsburgh*, 435 F.Supp. 1328, 1355–56 (W.D.Pa.1977):

I am speaking of cases in general of tenure, it means that a given person at a given time in a given department did not fill a particular set of needs.

I can think of one, one of the greatest scholars in America today who did not receive tenure at Harvard and who might possibly be the next Secretary of State. I think that the fact that that particular person didn't receive tenure at Harvard puts him in a class with thousands of other outstanding individuals in America who did not get tenure at a given place at a given time.

In conclusion, we find that the defendant did not violate Title VII of the Civil Rights Act of 1964 when it denied the plaintiff tenure in 1973. Accordingly, an order will be filed this date, entering judgment in favor of the defendant, Lehigh University, and against the plaintiff, Biruta Cap. This memorandum is in lieu of findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

---

year extension. She claims that she could have strengthened her record in the areas of research and service if she had received the addi-

tional year. The Court also finds that Lehigh's refusal to grant her an additional year was not because of her sex.