Robert RIVERS

v.

WESTINGHOUSE ELECTRIC CORPORATION.

Civ. A. No. 76–3193.

United States District Court,
E. D. Pennsylvania.

March 9, 1978.
As Amended April 21, 1978.

---

Ralph David Samuel, Philadelphia, Pa., for plaintiff.

Judith E. Harris, Dona S. Kahn, Philadelphia, Pa., Mary Helen Chiodo, Pittsburgh, Pa., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

HUYETT, District Judge.

Following a non-jury trial concluded on February 9, 1978, we make the following Findings of Fact and Conclusions of Law as required by Fed.R.Civ.P. 52(a).

### FINDINGS OF FACT

1. Plaintiff in this action, Robert Rivers, is a black adult male. Defendant, Westinghouse Electric Corporation (Westinghouse), is a corporation with a plant located in Lester, Pennsylvania.

2. On July 16, 1951, plaintiff was hired by defendant and began work as a sweeper at defendant's Lester Plant. Since June 10, 1957 plaintiff has been employed by defendant as a fitter-assembler, labor grade 11, which is the highest labor grade within his job classification.

3. Except for a period of military service, plaintiff was continuously employed by defendant until May 2, 1975, when Westinghouse terminated plaintiff's employment effective March 10, 1975.

4. Plaintiff was disciplined by defendant on twenty-three (23) separate occasions between March, 1959 and his discharge effective March 10, 1975 (Exhibit D–8a).

5. During the year 1970 plaintiff was absent (excluding vacation days and holidays) thirty-four (34) of 148 regular working days (excluding vacation days and overtime hours scheduled) (Exhibit D–8).

6. During the year 1971 plaintiff was absent (excluding vacation days and holidays) seventy-nine (79) of 220 regular days (excluding vacation days and overtime hours scheduled) (Exhibit D–8).

7. During the year 1972 plaintiff was absent (excluding vacation days and holidays) fifty-four (54) of 232 regular working days (excluding vacation days and overtime hours scheduled) (Exhibit D–8).

8. During the year 1973 plaintiff was absent (excluding vacation days and holidays) eighty-three (83) of 241 regular working days (excluding vacation days and overtime hours scheduled) (Exhibit D–8).

9. During the year 1974 plaintiff was absent (excluding vacation days and holidays) sixty-one (61) of 232 regular working days (excluding vacation days and overtime hours scheduled) (Exhibit D–8).

10. During the period from January 1, 1975 to March 10, 1975 plaintiff was absent (excluding vacation days and holidays) forty-nine (49) of seventy-one (71) regular working days (excluding vacation days and overtime hours scheduled) (Exhibit D–8).

11. During the years 1970 to 1975 plaintiff arrived late or left early as set forth below:

|      | LATE ARRIVAL | LEFT EARLY |
| ---- | ------------ | ---------- |
| 1970 | 2            | 20         |
| 1971 | 8            | 29         |
| 1972 | 4            | 32         |
| 1973 | 9            | 38         |
| 1974 | 5            | 15         |
| 1975 | 1            | 6          |

12. Plaintiff was absent from March 11, 1975 until his termination on May 2, 1975. (Effective March 10, 1975, his last day worked). Plaintiff's last contact with defendant before his discharge was by a telephone call to defendant's employment department on March 13, 1978 informing defendant that plaintiff was ill and would be out of work indefinitely.

13. Defendant has an employment rule requiring employees who are absent to report their whereabouts to defendant by contacting the employment office or the infirmary at least once in five (5) working days (Exhibit D–17).

14. After defendant had not heard from plaintiff for several weeks, Mr. Kline, area manager for heavy machinery; Mr. Gavin, Manager of Labor Relations; and Mr. Kulokoski, person in charge of employee rela-tions for hourly employees, reviewed plaintiff's personnel file. Because of plaintiff's past record of absenteeism, which they considered to be excessive, and plaintiff's current extended absence without contacting defendant, the defendant decided to engage an outside agency to ascertain the whereabouts of the plaintiff, and on April 7, 1975, did so.

15. Race was not a factor in the defendant's decision to retain an outside agency to investigate the plaintiff. Rather, the decision to investigate the plaintiff was based solely upon plaintiff's poor attendance and disciplinary record, and his extended absence without giving notice to defendant.

16. On April 18, 1975, plaintiff forwarded a disability claim form to defendant. Said disability claim form contained a certification by plaintiff that he was totally disabled and unable to work either for himself or for any company and that he would return to work as soon as possible (Exhibit D–9).

17. On April 24, 1975 the third-party investigators commissioned by defendant submitted a written report to defendant that plaintiff had been observed working at a bar on April 15, 1975, in the morning and until late in the evening. According to the investigator, Mr. Rivers was introduced to him as "the owner of the Monte Carlo Club". On the basis of the report, defendant could, and did in fact, reasonably believe that plaintiff was not disabled and was engaged in outside employment (Exhibit D–10).

18. Following the receipt of the investigative report, defendant suspended plaintiff because he had been falsely claiming disability during the period when he was observed tending bar and because plaintiff's overall attendance record was poor. Defendant then reviewed plaintiff's employment record, including his attendance and disciplinary records, together with his April 18, 1975 claim for disability and met with representatives of plaintiff's union to discuss his conduct. Defendant decided to terminate plaintiff on May 2, 1975, effective March 10, 1975, his last working day (Testi-

mony of Mr. Kulokoski; Exhibit D–18; Deposition of Mr. Gavin, pp. 19, 58 and 81).

19. There is no significant difference between defendant's treatment of the plaintiff and of similarly situated white employees who were charged with falsifying disability claims. Specifically, those who had good attendance records, such as Messrs. Kastor, DiLucia, and Hazzard, were reinstated following suspension. Those with poor attendance records, such as Mr. Barrett, were released and not reinstated. Furthermore, black employees Messrs. Cassel and Pendleton were treated in the same manner as similarly situated white employees (Testimony of Mr. Kulokoski).

20. There is no significant statistical difference between the number of black employees applying for disability who are subsequently discharged for falsification of disability forms, and the number of white employees applying for disability who are subsequently discharged for falsification of disability forms (Exhibit D–15; Testimony of Dr. Siskin).

21. Excessive absenteeism is a significant personnel problem at defendant's Lester Plant. Such absenteeism tends to cause production delays which are costly to the defendant.

22. Defendant discharged plaintiff for his overall poor work record, including his extensive absences and falsification of disability claim. Race was not a factor in defendant's decision to terminate plaintiff.

23. During the course of his employment with defendant plaintiff was not treated differently from similarly situated white employees in the allocation of job assignments (Testimony of Mr. Lynch, Mr. Kline, and Mr. Kulokoski).

24. Plaintiff was restored to work effective March 31, 1977 by an award of arbitrator which converted plaintiff's discharge into a two (2) year disciplinary furlough. Said restoration was without back pay or interim seniority for the period March 10, 1975 to March 31, 1977.

25. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC") on October 14, 1975. The EEOC issued a notice of right to sue to plaintiff on July 20, 1976.

## DISCUSSION

This employment discrimination case arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. Plaintiff alleges that defendant Westinghouse discriminated against him by reason of his race in connection with his discharge in the late Spring of 1975.

Plaintiff has, in essence, alleged that defendant discriminated against him in two ways. First, plaintiff argues that the decision to investigate his absence from work was discriminatorily made. In attempting to prove this contention, plaintiff introduced testimony concerning defendant's discriminatory animus toward plaintiff and statistical evidence demonstrating that proportionately more blacks than whites were investigated for possible rule infractions. Second, plaintiff contends that, once the investigation had taken place, defendant's decision to discharge him and subsequent refusal to reinstate him were discriminatorily made. This contention was buttressed by evidence of allegedly disparate treatment of similarly situated whites and by statistical evidence that black employees at Westinghouse are more frequently discharged for rule infractions than are white employees.

Guidelines governing apportionment of the burden of proof in cases of individual employment discrimination were set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *McDonnell Douglas* directed that "The complainant in a Title VII trial . . . carry the initial burden under the statute of establishing a prima facie case of racial discrimination." *Id.* at 802, 93 S.Ct. at 1824. In a dismissal case such as this, the elements constituting a prima facie case are (1) that plaintiff is a member of a protected class, (2) that plaintiff was the object of adverse action, and (3) that such adverse action befell plaintiff because of his

race. *See Wetzel v. Liberty Mutual*, 508 F.2d 239, 258–59 (3d Cir. 1975); *cf. McDonnell Douglas Corporation v. Green*, *supra*, 411 U.S. at 802 n. 13, 93 S.Ct. 1817. The latter element may be shown by the introduction of evidence of intentional racial discrimination or a showing that a facially neutral practice has a discriminatory impact. Once a prima facie case of discrimination has been established[1] the burden shifts to the defendant to articulate legitimate nondiscriminatory reasons for the unequal treatment. The justification must be proven by a preponderance of the evidence. *See Rodriquez v. Taylor*, No. 76–2609, 569 F.2d 1231 at 1239 (3d Cir. 1977); *Ostapowicz v. Johnson Bronze Company*, 541 F.2d 394, 399 (3d Cir. 1976). Even if the defendant meets its burden, the plaintiff is afforded the opportunity to show that the defendant's proffered reason is mere pretext.

■ We believe that the defendant has successfully rebutted, by a preponderance

---

1. Some confusion still remains concerning the allocation of the burden of proof in a Title VII case. More specifically, it is not yet clear exactly when the burden of persuasion shifts to the defendant. The language of *McDonnell Douglas* refers only to the "burden" allocated to each party without specifying whether the burden is of *production* or *persuasion*. However, by use of the expression "prima facie" case in describing the plaintiff's initial burden, the Court seemed to imply that the plaintiff only has the initial burden of production. In other words, once a plaintiff is able to establish a prima facie case sufficient to defeat a motion for a directed verdict, the burden of persuasion then shifts to the defendants. *See Ostapowicz v. Johnson*, 541 F.2d 394 (3d Cir. 1976).

However, the Supreme Court in *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) placed this interpretation in question. There the Court stated, "Respondents, who seek to establish discrimination, have the traditional civil litigation burden of establishing that the acts they complain of constituted discrimination in violation of Title VII. . . . In [*Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)], the burden placed on the employer 'of showing that any given requirement must have a manifest relationship to the employment in question,' . . . did not arise until discriminatory effect had been shown." *Id.* 429 U.S. at n. 14, 97 S.Ct. at 409. This language in *Gilbert* can be interpreted as meaning that the burden of persuasion of the issue of discrimination always remains with the plaintiff. However, once the plaintiff has proven discrimination by a preponderance of the evidence, the defendant assumes the burden of showing that any requirements it imposes are justified by a nondiscriminatory "business necessity." Thus, a defendant has essentially two potential strategies. It can rebut the fact of discrimination in the first instance by, for example, attacking the basis for plaintiff's statistics. Or, it can presume discriminatory impact and shoulder the burden of proving that this impact was caused by policies which have a nondiscriminatory business purpose. This interpretation was embraced by Judge Newcomer in *Croker v. Boeing Co.*, 437 F.Supp. 1138 (E.D.Pa.1977). *See also Henry v. Ford Motor Co.*, 553 F.2d 46 (8th Cir. 1977), where the court interpreted the term "prima facie case" as used in *McDonnell Douglas* as meaning that "if the net of the evidence adduced by both parties leaves the fact finder convinced that there has been disparate treatment . . . there has been a prima facie showing of racial discrimination and the burden of proof then shifts to the company to prove the employee was treated in the manner complained of for valid reasons other than race."

However, the Third Circuit has recently discussed this matter in *Rodriquez v. Taylor*, No. 76–2609, 569 F.2d 1231, at 1239 (1977). In *Rodriquez*, a case brought under the Age Discrimination in Employment Act (ADEA), the burden of proof under the ADEA was compared with that under Title VII. The Court of Appeals, in dicta, stated that after Title VII plaintiffs meet their initial burden of production, "the burden of production then shifts to the defendant to adduce evidence of non-discriminatory motivation." The court then stated that "if an employer produces evidence of a non-discriminatory reason for an employment decision, he may bear the burden of persuasion on that ultimate issue.[14]" In footnote 14, the court noted, "The majority of circuits have construed the *Green* case as shifting the burden of persuasion to the defendant employer once a plaintiff presents a prima facie case of employment discrimination," *citing Ostapowicz v. Johnson Bronze Co., supra*.

The language of *Rodriquez* leaves us somewhat confused. Plaintiff in the case before us has presented a prima facie case of discrimination in the sense of presenting sufficient evidence to avoid a directed verdict. However, plaintiff has not proven discrimination by a preponderance of the evidence. The question is whether this is required, or whether the *defendant* has the burden of proving that there was no discrimination.

Fortunately, in this case it makes no difference who has the burden. We believe that, even if the defendant has the burden of showing that there was no disparate treatment, that burden has been amply met.

of the evidence, any inference of discrimination in its investigation or discharge which may have been raised by plaintiff's case in chief. With respect to the charge of discrimination in investigation, we note that plaintiff introduced *no* evidence of similarly situated white employees who were not investigated. In support of his claim, plaintiff relied instead upon testimony of racial bias on the part of plaintiff's foreman, Jack Lynch, and upon evidence of a statistical disparity between white and black employees investigated.[2] However, no evidence of racial bias on the part of Mr. Kline, Mr. Gavin, or Mr. Kulokoski was introduced; these are the persons who actually made the decision to investigate plaintiff. All the evidence supports the finding that the decision to investigate plaintiff was based solely upon his excessive absenteeism and the length of his current absence.

Concerning the charge of discrimination in discharge, it may be helpful to note what is *not* at issue here. It is not relevant for our purposes whether or not plaintiff was in fact disabled, or whether he was actually employed at the Atmosphere Lounge or Monte Carlo Club. *See Turner v. Texas Instruments*, 555 F.2d 1251 (5th Cir. 1977). The Court of Appeals in *Turner* held that a dismissal based upon an honest but mistaken belief that a minority employee was guilty of a rule infraction did not violate Title VII.

Thus, the only relevant inquiry consists of two parts: (1) whether or not the defendant reasonably and in good faith believed that the plaintiff falsified his disability claim, and (2) given such a belief, whether or not the defendant treated plaintiff differently from others committing the same infraction.[3] After reviewing the report submitted by the third-party investigators, and considering the testimony given at trial, we conclude that defendant had reasonable grounds to believe that the plaintiff had falsified his disability form. Given this belief, coupled with the plaintiff's poor attendance record, plaintiff was treated no differently from similarly situated white employees.

In sum, we conclude that defendant has convincingly rebutted plaintiff's allegation of discriminatory treatment.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject of this action under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

2. This court has jurisdiction of the parties.

3. Defendant Westinghouse Electric Corporation is an "employer" within the meaning of Title VII of the Civil Rights Act of 1964, *as amended.*

4. Defendant has rebutted by a preponderance of the evidence plaintiff's prima facie case of discrimination by proving that race was not a factor in the decisions to investigate and discharge the plaintiff.

5. The decision to investigate the plaintiff was based solely upon plaintiff's poor absentee record and his prolonged absence.

6. The decision to discharge the plaintiff was based solely upon plaintiff's falsification of his disability claims form and his poor absentee record. The defendant reasonably and in good faith believe that the plaintiff was not disabled and was employed elsewhere.

7. Defendant had a fairly articulated discipline policy in connection with employ-

---

2. We believe that defendant's expert successfully attacked the data base used by the plaintiff's expert in reaching his conclusion.

3. Disparate treatment may violate Title VII even if the employee's actions otherwise justify dismissal. The Supreme Court held in *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), that a Title VII violation was alleged where a black employee was dismissed for commission of a serious criminal offense while a white employee who allegedly committed the same offense was not dismissed. While dismissal for commission of a criminal offense may be a defensible business policy, the Court reasoned, it must be applied similarly to all employees. *Id.* at 283, 96 S.Ct. 2574.

ee falsification of disability claims which was job-related and non-discriminatory. This policy was fairly applied in making the decision to discharge the plaintiff.

8. The defendant did not discriminate against plaintiff on the basis of race or color in violation of 42 U.S.C. § 1981 or Title VII of the Civil Rights Act of 1964.