Connie Rae KUNDA, Plaintiff,

v.

MUHLENBERG COLLEGE.

Civ. A. No. 77–1955.

United States District Court,
E. D. Pennsylvania.

Oct. 19, 1978.

As Amended Nov. 17, 1978.

Roy Yaffe, Yaffe & Golden, Philadelphia, Pa., for plaintiff.

Roberta S. Staats, Morgan, Lewis & Bockius, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW AND ORDER

HUYETT, District Judge.

Plaintiff Connie Rae Kunda brought this action against her previous employer, Muhlenberg College, pursuant to Title VII of the Civil Rights Act of 1964, *as amended,* 42 U.S.C. § 2000e *et seq.* (Supp. V). In her complaint, plaintiff claimed that she had been denied promotion and a grant of tenure because of her sex.[1] We held a trial non-jury and now make the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a).

## FINDINGS OF FACT

1. Plaintiff, Connie Rae Kunda, is a female citizen of the United States residing at 1151 North 28th Street, Allentown, Lehigh County, Pennsylvania. She was employed by Muhlenberg College as an in-

---

1. Plaintiff's complaint also raised other claims as a basis of this action, including a claim pursuant to 42 U.S.C. § 1985(3) and a state law claim for breach of contract. We granted summary judgment for defendant on these claims in an Order dated April 20, 1978.

structor in the Department of Physical Education from September, 1966 through June, 1975. (Stipulation, ¶ 1)

2. Muhlenberg College (College) is a non-profit corporation organized and existing under the laws of the Commonwealth of Pennsylvania with principal administrative offices and places of instruction located in Allentown, Lehigh County, Pennsylvania. (Stipulation, ¶ 2)

3. John H. Morey has been President and Chief Executive Officer of Muhlenberg College since September 1, 1969. (Stipulation, ¶ 3)

4. Philip B. Secor was Dean of Muhlenberg College from July 15, 1967, until July 31, 1974. (Stipulation, ¶ 4)

*College Practices and Policies*

5. The following provision of the Muhlenberg College Bylaws (Bylaws), which has since at least 1966 been included in the Muhlenberg College Faculty Handbook, is the provision regarding tenure which was in effect at all times plaintiff was a member of the faculty at Muhlenberg College:

> Continuous tenure shall be granted only by action of the Board of Trustees upon recommendation of the President. A faculty member shall obtain continuous tenure upon reappointment after seven years' full-time college and university teaching at the rank of Instructor, Assistant Professor or Associate Professor, at least four of which shall have been at the College. Not more than three of the total seven years shall be served at the rank of Instructor. No persons, however, shall teach at the College for more than nine years without obtaining continuous tenure. . . . (Exhibit No. 101)

At all times relevant to this matter, President Morey interpreted that portion of the tenure statement in the Bylaws providing that "not more than three of the total seven years" be served at the rank of Instructor as requiring that a faculty member have served at least four years at a professorial rank, *i. e.* a rank above Instructor, prior to undertaking a tenured appointment. (This portion of the Bylaws will be hereinafter

referred to as the "three-year rule.") However, a different interpretation was given to the "three-year rule" by other faculty members. For example, Dr. Lohr, who took part in drafting the College Tenure Policy, did not believe that the three-year rule placed a limit on the ability of a faculty member who had served only as an Instructor to obtain tenure. Dr. Lohr interpreted the entire relevant clause of the College Bylaws as providing that a faculty member receives tenure *automatically* if he or she receives an appointment after teaching for seven years, so long as not more than three of those years were at the rank of Instructor. (Testimony of Dr. Lohr; Exhibit No. 69)

6. At all relevant times, the Board of Trustees retained the power to grant tenure to a faculty member even if the faculty member had not served for four years at a professorial rank. (Testimony of Dr. Reumann)

7. The policy of the College which was in effect at all times relevant to this action with respect to requirements for promotion was set forth in the Faculty Handbook as follows:

*Promotion Requirements*

Promotion is awarded for meritorious service to the College. For promotion to Professor or Associate Professor, the Ph.D. or its scholarly equivalent or recognized achievement in a field shall be required. These requirements normally apply to the rank of Assistant Professor also, although this rank may be obtained without the Ph.D. if there is sufficient evidence of progress toward the completion of all requirements for the degree. (Stipulation, ¶ 5)

8. A requirement for the grant of tenure at the College, although not specifically set forth in the Faculty Handbook, was the attainment of the Ph.D. (terminal degree), or its scholarly equivalent, or recognized achievement in a field. (Testimony of Dr. Lohr, President Morey)

9. For purposes of tenure and promotion, the masters degree was recognized as

the terminal degree for members of the Physical Education Department. (Exhibits Nos. 43, 47)

10. The Faculty Handbook sets forth the normal pattern of promotion as follows:

*Pattern of Promotion*

A. *To Assistant Professor*:

No person may remain indefinitely at the rank of Instructor although contracts as Instructor may be renewed annually for no more than nine years.

B. *To Associate Professor*:

Promotion normally takes place before six years of full-time teaching as Assistant Professor. During the third year of active teaching at the Assistant's rank, a comprehensive review of the individual's record shall be made and continued yearly thereafter, as necessary.

C. *To Professor*:

Promotion normally takes place any time after six years of full-time teaching as Assistant Professor. During the sixth year of active teaching at the Associate's rank, a comprehensive review of the individual's record shall be made and continued yearly thereafter, as necessary. (Stipulation, ¶ 5)

11. The Faculty Handbook sets forth the procedures followed by the College with respect to the awarding of promotion or the granting of tenure. The process is usually initiated by the Department Chairman, who prepares a recommendation in writing and forwards it to the Dean of the College. The Dean then sends to the Faculty Personnel and Policies Committee (FPPC) the personnel files and recommendations of Department Chairmen of those persons to be considered for promotion or tenure. The FPPC discusses those persons, and votes upon its recommendations for promotion or tenure; the Committee subsequently forwards a written recommendation concerning each candidate to the President. The criteria used by the FPPC in deciding whether to recommend a faculty member for promotion or tenure are those listed in the Faculty Handbook. The President reviews the recommendations of the Department Chairmen, the Dean, and the FPPC

and then makes a decision as to the recommendation for promotion or tenure with respect to each candidate. The President's recommendations are then sent to the Board of Trustees, which makes the final decision with regard to promotion and tenure.

12. Additionally, the College has a Faculty Board of Appeals (FBA), made up of seven non-administrative faculty members and three alternates elected by the faculty, which is charged with considering, on appeal, questions of promotion and tenure with regard to individual faculty members and making recommendations to the President.

13. The FPPC and the FBA are charged with the responsibility of communicating to the President the faculty's recommendation with respect to promotion and tenure of candidates.

14. In May, 1974, the Board of Trustees approved a modification of the College's tenure policy which provided that new faculty *hired* after the 1973–74 academic year would be offered only "non-tenurable" positions in departments already two-thirds or more "tenured." That policy affected only persons initially hired in or after the 1974–75 academic year and did not affect the tenure consideration of "non-tenured" faculty members, including plaintiff, who had been on the faculty prior to 1974–75. The plaintiff was considered for promotion and tenure in accordance with the procedures and regulations which were in effect at the time she was hired.

*Summary of Plaintiff's Employment at Muhlenberg College*

15. Plaintiff was initially appointed as Instructor in the Physical Education Department of the College for the 1966–67 academic year (Exhibit J.6) and was thereafter reappointed annually to serve through the 1974–75 academic year. At the time plaintiff was hired by Muhlenberg, she was not told that a masters degree was necessary for employment with or advancement at Muhlenberg. (Stipulation, ¶¶ 11, 12, 13,

15, 16, 18, 22, 31, 53; Testimony of Mrs. Kunda).

16. A department chairman normally initiates action with regard to promotion and tenure of a faculty member in his or her department by forwarding a written recommendation to the Dean. Raymond Whispell was the Chairman of the Physical Education department at Muhlenberg College during the entire period of plaintiff's employment at the College. (Stipulation, ¶ 8)

17. On February 13, 1969, Professor Whispell sent a memorandum to Dean Secor in which he rated Mrs. Kunda's performance as "superior" and stated that he planned to recommend her for a promotion in the near future. However, Professor Whispell did not actually recommend that plaintiff be promoted to the rank of Assistant Professor until October 14, 1971 during plaintiff's fifth year on the Muhlenberg faculty. (Exhibit Nos. 13 and 22)

18. In response to Professor Whispell's recommendation, plaintiff's name was submitted by Dean Secor to the FPPC for consideration for promotion. The vote of the FPPC with respect to the promotion of Mrs. Kunda, taken at a meeting held December 14, 1971, was three (yes) to three (no). (Stipulation ¶¶ 19, 20; Exhibit No. 23) President Morey viewed this tie vote as a failure to recommend and did not recommend plaintiff for promotion. (Testimony of President Morey; Exhibit No. 95)

19. Professor Whispell appealed the denial of plaintiff's promotion and asked the FPPC to reconsider its decision. In connection with this reconsideration, Professor Whispell appeared at a meeting of the FPPC and spoke on behalf of Mrs. Kunda. (Exhibit No. 27) At its meeting on March 15, 1972, the FPPC reviewed the additional information supplied by Professor Whispell with respect to promotion of Mrs. Kunda, discussed the matter, and voted on whether or not to recommend promotion. (Exhibit No. 30) Although Dean Secor generally absented himself from meetings of the FPPC called specifically for voting on candidates for promotion and tenure, he was present at the meeting at which the FPPC considered Mr. Whispell's appeal. At that meeting, Dean Secor told the FPPC that the future of the Physical Education Department was in doubt and suggested that a decision to promote Mrs. Kunda should be made at a later date. (Testimony of Dr. Lohr) By a vote of four (no) to two (yes), the FPPC voted not to recommend plaintiff for promotion. (Exhibit No. 31)

20. In the late Spring of 1972, after she was denied promotion, Mrs. Kunda spoke with Professor Whispell, Dean Secor, and President Morey to ascertain the reasons for the denial. None of those persons told Mrs. Kunda that she was not promoted because she lacked a masters degree, or stated that a masters degree would be mandatory in order for her to be promoted or considered for tenure in the future. (Testimony of Mrs. Kunda, Professor Whispell; deposition of Dean Secor)

21. Plaintiff was next considered for promotion in the 1972–73 academic year. By memorandum dated October 5, 1972 to Dean Secor, Professor Whispell recommended that plaintiff be promoted to Assistant Professor in the department of Physical Education. (Exhibit No. 38) By memorandum dated December 14, 1972, Dean Secor advised the Chairman of the FPPC that, through "an egregious oversight" on his part, Professor Whispell's recommendation that plaintiff be promoted had not been brought to the FPPC's attention during the time it was considering other recommendations for tenure and promotion; Dean Secor requested that the Chairman bring the matter of promotion of Mrs. Kunda to the attention of the FPPC with all dispatch. (Exhibit No. 39) By December 14, 1972, Dean Secor had already forwarded his recommendations concerning promotions to President Morey, President Morey had already forwarded his recommendations for granting promotions to the Board of Trustees, and the Board of Trustees had already approved all of President Morey's recommendations. (Exhibit Nos. 39 and 77) At the meeting of the FPPC of January 25, 1973, the FPPC unanimously

recommended that Mrs. Kunda be promoted.

22. The basis for the FPPC's recommendation that Mrs. Kunda be promoted was the Committee's belief, on the basis of Mrs. Kunda's credentials, that she had attained the scholarly equivalent of a masters degree and recognized achievement in her field. (Testimony of Dr. Lohr and Dr. Reed)

23. President Morey did not recommend to the Board of Trustees that Mrs. Kunda be promoted to the rank of Assistant Professor. (Stipulation ¶ 30) The Board of Trustees did not grant plaintiff a promotion.

24. Pursuant to the College Bylaws and in keeping with AAUP standards, the College was required to offer plaintiff a terminal contract of employment for the 1974–75 academic year if she were not awarded tenure in the 1973–74 academic year.

25. By memorandum dated September 27, 1973 directed to Professor Whispell, Dean Secor reminded Professor Whispell that Mrs. Kunda would be considered for tenure during the current semester and requested Professor Whispell's recommendation in this matter. (Exhibit No. 50) By memorandum dated October 2, 1973 directed to Dean Secor, Professor Whispell and all senior members of the Physical Education Department recommended plaintiff for tenure and promotion to the rank of Assistant Professor. (Exhibit No. 51) Plaintiff was among the faculty members whose promotion and/or tenure was considered by the FPPC in October and November, 1973; in connection therewith, the Committee interviewed Mrs. Kunda on October 29, 1973. (Exhibit No. 53) At the November 12, 1973 meeting of the FPPC, the Committee unanimously recommended that plaintiff be granted tenure. The FPPC reported all recommendations to the President and Dean by memorandum dated November 16, 1973. (Stipulation ¶¶ 32–25; Exhibit No. 57)

26. The FPPC explained its recommendation that plaintiff be granted tenure in a memorandum dated November 16, 1973, as follows:

1) Teaching

Mrs. Kunda is regarded by her colleagues as an excellent teacher of physical education. In the area of dance—her specialty—she has developed and introduced course offerings for Muhlenberg students—both men and women—in "Ballet", "Modern Dance", and "Tap Dance", among others. In addition, she had developed course offerings in physical fitness. Her deep interest in her specialty and in physical education in general is attested to by her participation in many and varied professional organizations both on and off the campus, and at the local and state levels. She is vitally interested in her students and had over the years established an excellent rapport with them as is evidenced by her success in counseling them in educational as well as personal matters.

2) Research and Creative Work

Connie has actively engaged in a variety of post-graduate courses over the past five years. Her work and study have resulted in several publications on her specialty—the dance—in various professional journals on Physical Education.

3) College and Public Service

She is also active in local women's groups and professional organizations. She has in the past presented on local TV a series on physical education and was recently scheduled for a new TV presentation on "Fun and Fitness" with Mr. Kuntzelman, a former member of Muhlenberg's Athletic Department faculty.

4) Religious Commitment

We think an individual's religious commitment is a highly personal matter on which we do not feel competent to comment or judge.

It seems to us that the usual requirement for the Ph.D. does not apply in this case. We should instead measure the professional performance of Mrs. Kunda in teaching physical education at Muhlenberg, participating in professional groups as an officer or as a member, continuing her professional development by attending post-graduate courses and demon-

strating her competence before the local audience on Channel 39 TV. (Exhibit No. 56)

27. The November 16, 1973 memorandum of the FPPC, the October 2, 1973 memorandum from Professor Whispell to Dean Secor, and the testimony of Professor Whispell, Ms. Hospodar and Professor Lohr clearly show that in the opinion of the senior members of both her department and the faculty of Muhlenberg, plaintiff had satisfied all of the requirements for promotion and tenure as set forth in the Faculty Handbook.

28. Plaintiff had satisfied both alternatives to the terminal degree requirement for promotion and tenure—the scholarly equivalent of the masters degree and recognized achievement in her field—as of November 16, 1973, and continued to satisfy these requirements until the time of her tenure denial. (Testimony of Dr. Lohr, Professor Whispell, and Professor Beidleman; Exhibit No. 88)

29. By memorandum dated November 30, 1973 to President Morey, Dean Secor recommended that the President not present to the Board of Trustees the name of Mrs. Kunda for tenure appointment on the College faculty. This recommendation stressed the high quality of plaintiff's performance at Muhlenberg and the difficulty of applying the traditional criteria in evaluating plaintiff's performance, and concluded that "her performance justifies a permanent appointment." However, Dean Secor did not recommend that tenure be granted because of the high percentage of tenured faculty in the Physical Education Department and the economic uncertainty about the future of the department. Dean Secor did not mention Mrs. Kunda's lack of a terminal degree as a basis for denying her tenure. (Exhibit No. 58)

30. President Morey declined to recommend to the Board of Trustees that plaintiff be awarded tenure because of her lack of an advanced degree such as would have qualified her for promotion to the rank of Assistant Professor.

31. By letter dated June 14, 1974, President Morey advised Mrs. Kunda that she had not been recommended to the Board for tenure and that the contract tendered to her for the 1974–75 academic year was a terminal one. (Stipulation, ¶ 38; Exhibit No. 62)

32. By letter dated September 23, 1974, Mrs. Kunda advised the Chairman of the FBA that she sought to appeal the decision not to award her tenure. (Exhibit No. 63) Mrs. Kunda submitted to the Board of Appeals "an outline pertaining to my nine years at Muhlenberg College and why I am appealing to your Committee. . . ." One of her stated reasons for appealing was that she was never given any warning of a need to improve herself professionally or academically, nor was she ever told that a masters degree would be required in order for her to be promoted or granted tenure. (Exhibit No. 65). At the October 11, 1974 meeting of the FBA, Professor Whispell spoke on Mrs. Kunda's behalf and presented to the Board a written statement concerning plaintiff's appeal. Mrs. Kunda also appeared before the FBA on October 11, 1974 in connection with her request that the FBA consider her appeal. (Exhibit No. 68) The FBA determined "to undertake a full-scale examination of Mrs. Connie Kunda's qualifications for tenure and to report its conclusions to the President." (Stipulation, ¶¶ 39–41; Exhibit Nos. 68, 71)

33. The FBA made the following observations and conclusions, which we find are accurate, in their Report dated November 11, 1974:

At each of several crucial points unfortunate circumstances prevented her case from being given fair consideration. In addition, testimony indicated that the qualifications of Mrs. Kunda were such that had her case been properly presented at the proper times the eventual tenure decision might well have been different from what it was.

. . . . .

Dr. Secor's oversight [in failing to forward plaintiff's promotion recommendation at the proper time] may well have

materially affected the decision not to recommend her promotion to the Board of Trustees.

In this report, the FBA also noted that it "ha[d] yet to uncover any statement about [Mrs. Kunda's] contributions to the College that was less than enthusiastic." (Exhibit No. 77)

34. It was determined by the FBA with the agreement of President Morey, that a three member subcommittee of the FBA would review all materials pertinent to plaintiff's appeal. The FBA appointed Professors Baldridge (Chairman), Thornburg and Weston to the said subcommittee. (Exhibit No. 82) At the request of the FBA, plaintiff submitted to it "a complete record of her professional career and her contribution to the College." At the January 16, 1975 meeting, the report of the subcommittee was presented to the FBA. The subcommittee unanimously moved that the FBA recommend that plaintiff be awarded tenure and promoted to the rank of Assistant Professor. (Exhibit No. 86) The motion unanimously carried, and the recommendation was communicated to President Morey.

35. The Report and Recommendation of the FBA dated January 20, 1975, included the findings of that Committee that plaintiff possessed the scholarly equivalent of a terminal degree, and that the terminal degree requirement had frequently been bypassed in the physical education department. (Exhibit No. 88)

36. The conclusions and supporting reasons in both the November 11, 1974 Report and the January 20, 1975 Report of the FBA represent the considered opinions of the senior faculty of Muhlenberg College who had been designated by their peers and colleagues to consider such matters. These are the people who are most familiar with the promotion and tenure processes at Muhlenberg College and the facts of plaintiff's case.

37. On February 19, 1975, President Morey advised Mrs. Kunda that he believed that she should be afforded an opportunity to present her case to the Committee on Educational Policies and Faculty Affairs of the Board of Trustees (Trustee Committee) and President Morey invited plaintiff to meet with the Trustee Committee. (Exhibit No. 92)

38. On February 24, 1975, President Morey provided the Trustee Committee with a memorandum purporting to contain the background of the Kunda affair. However, this memorandum in effect is a defense of President Morey's position in refusing to support the recommendations of the FPPC and FBA that plaintiff be granted promotion and tenure. In his memorandum, President Morey stated that plaintiff was not qualified for promotion or tenure because she lacked a masters degree. He failed to mention the alternative qualifications of the scholarly equivalent of the masters degree or recognized achievement in one's field. (Exhibit No. 95)

39. On March 13, 1975, the Trustee Committee met with Mrs. Kunda, who made an oral presentation and delivered to the Committee a written statement summarizing the reasons why she merited an award of promotion and tenure. Subsequent to the Trustee Committee's meeting with Mrs. Kunda, the Committee met with President Morey. President Morey affirmed his position that he could not recommend Mrs. Kunda for tenure because she lacked a terminal degree. On March 14, 1975, the Trustee Committee voted not to grant tenure to Mrs. Kunda. At the meeting of the full Board of Trustees on March 14, 1975, the recommendation of the Trustee Committee was adopted by the Board of Trustees of Muhlenberg College.

40. The Board of Trustees in good faith believed that since plaintiff had not earned a masters degree, she was not qualified for an award of tenure.

*Treatment of Male Personnel at Muhlenberg College*

41. From the 1971–72 academic year through the 1974–75 academic year there were nine full-time faculty members of the Physical Education Department, three of

whom were women. The names and academic degrees attained by those faculty members are as follows:

Professor Raymond Whispell—Bachelor of Science in Physical Education.

Professor William Flamish—Bachelor of Science in Commerce.

Professor Samuel Beidleman—Masters of Education (M.Ed.) in counselling.

Professor Helene Hospodar—M.Ed. in counselling.

Professor Ken Moyer—M.Ed. in counselling.

Ronald Lauchnor—B.S. in Biology.

Frank Marino—Masters of Science degree in Physical Education.

Jean Hecht—Masters of Science degree in Physical Education.

Connie Kunda—Bachelor of Science in Physical Education.

42. Ronald Lauchnor was hired to be an Instructor in the Physical Education Department in 1967. At that time and on numerous occasions thereafter, he was informed by Professor Whispell and others that obtaining a masters degree was a prerequisite for his promotion and tenure. (Testimony of Mr. Lauchnor) Mr. Lauchnor was enrolled in a masters program at one time, but discontinued his studies in 1969, after earning 24 credits towards his degree.

43. In December, 1971, the same year that plaintiff was first considered for promotion, Mr. Lauchnor was granted a promotion to the rank of Assistant Professor effective September, 1972. President Morey and Dean Secor recommended this promotion and the Board of Trustees granted it even though Mr. Lauchnor did not have a masters degree and was not enrolled in a masters degree program at that time. (Exhibit No. 105; Testimony of Mr. Lauchnor) President Morey and Dean Secor knew or should have known that Mr. Lauchnor did not have a masters degree and was not actively pursuing one. President Morey and Dean Secor failed to make an independent investigation of the status of Mr. Lauchnor's graduate study at the time they recommended that he be promoted.

44. On June 26, 1973, Dean Secor initiated a meeting with Mr. Lauchnor and specifically advised him that he ought to obtain a masters degree by the time he was considered for tenure because he would not be granted tenure without such degree. Dean Secor encouraged him to do all that he could to pursue a masters degree. (Exhibit No. 106; Testimony of Mr. Lauchnor)

45. During the academic year 1974–75, Mr. Lauchnor was recommended for an award of tenure by his department and was unanimously recommended for tenure by the FPPC. However, because Mr. Lauchnor did not hold a terminal degree, President Morey recommended that Mr. Lauchnor not be granted tenure. This recommendation was adopted by the Board of Trustees. (Exhibit Nos. 115, 116, 117)

46. Samuel Beidleman was hired to be an Instructor in the Physical Education Department in 1965. At that time, he had a Bachelor of Science degree in Math. On at least two occasions in the Fall of 1967 and Fall of 1968, he met with Dean Secor, who inquired into Mr. Beidleman's attempts to obtain a masters degree. These meetings were initiated by Dean Secor. Dean Secor advised him that a masters degree was a prerequisite to his tenure and promotion. (Testimony of Mr. Beidleman)

47. On February 28, 1969, Mr. Beidleman was recommended for a promotion to Assistant Professor, contingent upon completing his masters degree by September 1, 1969. Mr. Beidleman completed the requirements for a masters degree and was officially promoted in the Summer of 1969.

48. Mr. Robert Bohm, a professor in the Classics Department, was considered for tenure in the 1973–74 scholastic year. Mr. Bohm did not possess the terminal degree in his field of study and had stated that he had no intention of obtaining it. Nevertheless, Dean Secor recommended that he be granted tenure. President Morey and the FPPC recommended that Mr. Bohm not be granted tenure and the Board of Trustees affirmed this decision and denied Mr. Bohm tenure in June, 1974. In a letter to Mr.

Bohm dated October 1, 1974, President Morey stated that "a major consideration resulting in the negative tenure decision was not so much the fact that you had not obtained a Ph.D., but that, a year earlier, you specifically refused to pursue one." President Morey further reminded Mr. Bohm that the "College suggested that a sabbatical leave might be arranged to enable you to return to full-time doctoral study," but that Mr. Bohm declined to follow this suggestion. (Exhibit Nos. P–307 and P–306)

49. Prior to the time plaintiff was denied tenure, neither Professor Whispell nor any other members of the faculty or administration of Muhlenberg College ever counselled or advised plaintiff that she could not be promoted or granted tenure unless she obtained a masters degree. On the contrary, Professor Whispell told plaintiff that she was qualified for promotion and tenure because she had met the alternative requirement of having the scholarly equivalent of a terminal degree.

50. Plaintiff was treated less favorably than male members of her department by not being advised that the masters degree was an absolute prerequisite for promotion or tenure, nor being counselled that she should pursue a masters degree, by either her department chairman or the dean. Plaintiff reasonably believed that she could be promoted and granted tenure even though she did not possess a masters degree because she believed that she possessed the alternative qualifications listed in the Faculty Handbook, and because she was never informed that those alternative qualifications were not in fact applied. If plaintiff had been informed of the necessity to obtain a masters degree, she would have made every effort to do so because of her sincere desire to be awarded tenure. (Testimony of Mrs. Kunda)

51. The failure adequately to counsel plaintiff concerning the necessity of obtaining a masters degree constituted purposeful discrimination on the basis of sex. Dean Secor's disparate treatment of plaintiff as compared with male members of the Physi-cal Education Department was the result of discriminatory animus based upon sex.

52. The requirement that a faculty member possess a terminal degree in order to be promoted or granted tenure is a sex neutral criterion which is reasonably related to the legitimate needs of an educational institution such as Muhlenberg College. (Testimony of Dr. Kirkwood)

53. The requirement that a candidate for promotion in the Physical Education Department have a masters degree was not a neutral prerequisite for promotion that was uniformly applied to all members of the department, in that three male members of the department who did not have masters degrees were promoted. (Professors Whispell and Flamish, and Mr. Lauchnor) One of these persons, Ronald Lauchnor, was granted a promotion the same year that plaintiff was initially denied a promotion. Therefore, the stated reason for denying plaintiff a promotion—the lack of a terminal degree—was pretextual. Plaintiff was discriminated against on the basis of sex in the denial of a promotion.

54. The requirement that a candidate for tenure have a terminal degree was uniformly applied by the College. From December, 1970 through December, 1974, thirteen persons who were considered for tenure were not awarded tenure at Muhlenberg College. Seven of those thirteen persons lacked a terminal degree; all seven persons were not recommended for tenure by the President and were not awarded tenure by the Board of Trustees. Conversely, all seventeen persons considered for tenure during this time period who were granted tenure possessed a terminal degree.

55. During the period from December, 1970 through December, 1974, President Morey consistently applied the terminal degree requirements in making recommendations with respect to the award of tenure. During this period of time, the College consistently applied the terminal degree requirement with respect to the award of tenure. During this period of time, the alternative criteria listed in the Faculty Handbook were never in fact employed.

56. By requiring that plaintiff possess a terminal degree before being awarded tenure, the College did not treat plaintiff less favorably than male members of her Department or other Departments.

57. Plaintiff exercised reasonable diligence in attempting to find an employment position comparable to the one she held at Muhlenberg College. (Stipulation, ¶ 95)

## DISCUSSION

Plaintiff Connie Rae Kunda has advanced several theories upon which she bases her claim of sex discrimination in employment. First, plaintiff claims that she was treated less favorably by her employer, Muhlenberg College, than were male members of the Physical Education Department. Pursuant to this claim of disparate treatment, plaintiff asserts that she was denied promotion to the position of Assistant Professor and an award of tenure because of her sex. Plaintiff also raises a claim that the application of the terminal degree requirement for promotion and tenure had a disparate impact upon women.

Although both "disparate treatment" and "disparate impact" theories are cognizable under Title VII, methods of proving a prima facie case are different for each. The paradigm of a disparate treatment case is *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1977), where the Supreme Court set forth basic rules for the apportionment of burden of proof in an individual Title VII case. Stated briefly, the Court held that, once a prima facie case of discrimination is made by plaintiff, the burden shifts to defendant to "articulate a legitimate, nondiscriminatory" basis for its employment decision.

■■■ The Supreme Court has recently clarified the "exact scope" of a prima facie case in a disparate treatment context. In *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), the Court stated that the prima facie case is not the equivalent of an ultimate finding of discrimination, but merely "a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Id.* at 577, 98 S.Ct. at 2949. The prima facie case raises the inference that the defendant's actions, if not otherwise explained, are based upon discriminatory criterion. Upon proof of a prima facie case,[2] the defendant has the burden of "proving that he based his employment decision on a legitimate consideration, and not an illegitimate one such as race." *Id.*

■■■ In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Supreme Court noted that, in a disparate treatment case, "[p]roof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Id.* at n. 15, 97 S.Ct. at 1854. However, proof of discriminatory motive is encompassed within the prima facie case as defined by *McDonnell Douglas* and *Furnco*. The utility of the prima facie case is that it permits the inference of discriminatory animus, unless the defendant is able to prove that the employment decision was based upon legitimate, nondiscriminatory criteria. We do not believe however, that use of the prima facie case is necessarily the only way to show discriminatory motive in a disparate treatment case. *International Brotherhood of Teamsters v. United States, supra* at n. 15, 97 S.Ct. 1843. *See also Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 266–68, 97 S.Ct. 555, 50 L.Ed.2d

---

2. In *Rivers v. Westinghouse*, 451 F.Supp. 44 at n. 1 (E.D.Pa.1978), we discussed some of the confusion surrounding the meaning of the prima facie case. Although this confusion has not been completely dispelled, we believe that the *Furnco* decision makes it clear that plaintiffs in a Title VII case have the clear burden of proving discrimination by a preponderance of the evidence. *See also General Electric Co. v. Gil-*

bert, 429 U.S. 125, n. 74, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976).

With respect to the defense that a nondiscriminatory reason for the employment action exists, the rule in this circuit is that the defendant bears the burden of persuasion on that issue. *Rodriquez v. Taylor*, 569 F.2d 1231, n. 14 (3d Cir. 1977) *citing Ostapowicz v. Johnson*, 541 F.2d 394 (3d Cir. 1976).

450 (1976), where the Court, in a different context, discussed several ways that discriminatory motive may be proved.

Under the "disparate impact" theory, where facially neutral employment standards are alleged to have a disproportionate impact upon a protected group, it is not necessary to show discriminatory motive. *International Brotherhood of Teamsters v. United States, supra.* In order to establish a prima facie case, a plaintiff need only show that the employment standards under scrutiny have a statistically significant discriminatory impact. *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1976); *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

## I. *Disparate Treatment Theory*

### a. The Prima Facie Case

Before we can determine whether plaintiff has made out a prima facie case under her disparate treatment theory, we must define the exact content of the prima facie case. This may vary depending upon the factual situation involved. *International Brotherhood of Teamsters v. United States, supra* 431 U.S. at 358, 97 S.Ct. 1843. Since promotion and tenure decisions within a college or university environment are different in many significant ways from employment decisions elsewhere, we believe it is helpful to analyze carefully the purpose of the prima facie showing in order to identify the particular elements necessary to make such a showing in the case before us.

In *McDonnell Douglas v. Green*, where plaintiff alleged discrimination in hiring, the Supreme Court held that plaintiff established a prima facie case by showing "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." 411 U.S. at 802, 93 S.Ct. at 1824.

Under the facts of *McDonnell Douglas*, this initial showing was "adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under [Title VII]." *International Brotherhood of Teamsters v. United States, supra* 431 U.S. at 358, 97 S.Ct. at 1866.

In *International Brotherhood of Teamsters v. United States*, the Supreme Court noted that the *McDonnell Douglas* formula "does not require direct proof of discrimination." 431 U.S. at n. 44, 97 S.Ct. at 1866. Instead, the prima facie showing requires that a Title VII plaintiff demonstrate that the employment action under scrutiny did not result from other nondiscriminatory reasons which would commonly arise. Where, as in *McDonnell Douglas*, a claim of discrimination in hiring is raised, the plaintiff is required to show that "his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought." *Id.*

The decision to grant or deny a promotion to a college faculty member is not substantially different from a similar decision in business or industry. Therefore, we conclude that a prima facie case of discrimination in promotion is established by a showing (1) that plaintiff was a member of a protected group; (2) that plaintiff was qualified for promotion; (3) that plaintiff was considered for and denied promotion; and (4) that males with comparable qualifications were granted promotions. *Cf. Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394 (3d Cir. 1976). Once these elements are shown, lack of qualification and unavailability of a position are eliminated as reasons for denial of promotion, and the inference that sex was the cause for the denial of promotion is raised.

With regard to tenure, however, the elements of a prima facie case may be somewhat different. As noted in *Huang v. College of the Holy Cross*, 436 F.Supp. 639 (D.Mass.1977), tenure is actually a life contract with a faculty member and thus in-

volves a complex evaluation of the candidate's qualifications and the needs of the college. On the other hand, the denial of tenure at most colleges including Muhlenberg, results in the termination of a faculty member's employment. The denial of tenure thus becomes a "mixture" of the discharge and denial of promotion situations. *Id.* at 653.

■ Therefore, it is necessary that a party alleging sex discrimination in the denial of tenure show as three elements of her prima facie case (1) that she is a member of a protected group; (2) that she is qualified for tenure; and (3) that she was considered for and denied tenure. However, due to the unusual nature of the tenure decision and the undeniable fact that qualified faculty members may be denied tenure due to reasons relating to the needs of the college, we believe that an additional element must be shown in order to establish a prima facie case. Some courts have found this "additional element" in the existence of significant procedural irregularities in the tenure process. *See Huang v. College of the Holy Cross, supra; E. E. O. C. v. Tufts Institute,* 421 F.Supp. 152, 163 (D.Mass.1975). *See also Village of Arlington Heights v. Metropolitan Housing Corp., supra* 429 U.S. at 267, 97 S.Ct. at 564, where the Court stated "[d]epartures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role" in a given decision. We do not believe, however, that a showing of "procedural irregularities" is absolutely required. Alternatively a plaintiff may be able to show that males with similar qualifications were in fact granted tenure during the time period when plaintiff was being considered. In any case, where a plaintiff is able to demonstrate either or both of these "additional elements," a prima facie case is established.[3]

■ Turning to the facts of this case, we conclude that a prima facie case of sex discrimination in the denial of promotion and tenure has been established. Mrs. Kunda is clearly a member of a protected class. From 1971, when she was initially considered for promotion, until 1975, when tenure was finally denied her, Mrs. Kunda was qualified for tenure and promotion in the opinion of her colleagues in the Department of Physical Education and other departments in the College. (Findings of Fact Nos. 22, 27, 35) In the 1972–73 and 1973–74 school years, plaintiff was unanimously recommended by the FPPC for promotion because, according to the testimony of members of that committee, she had achieved the scholarly equivalent of a masters degree. The same conclusion was reached by the FBA in 1974 after it had exhaustively reviewed the plaintiff's credentials. In the face of the virtually unanimous opinion of those in a position to examine Mrs. Kunda's performance most closely, the Muhlenberg College faculty, that plaintiff was highly qualified for promotion and tenure, we are loathe to act as a "super-tenure review committee" and decide otherwise. *Cf. Johnson v. University of Pittsburgh,* 435 F.Supp. 1328 (W.D.Pa.1977).

■ In addition, several procedural irregularities occurred during the consideration of plaintiff's bid for promotion and tenure. First, the presence of Dean Secor at the FPPC meeting in March, 1972, when the committee considered Professor Whispell's appeal on behalf of Mrs. Kunda, was one such procedural irregularity.[4] (Finding

---

**3.** Defendant strenuously argued that plaintiff must also show that the College "sought applicants from persons of complainant's qualifications" following the denial of tenure. However, the purpose of a similar requirement under the facts of *McDonnell Douglas* was to insure that an employment position in fact was available. 411 U.S. at 802, 93 S.Ct. 1817. In the context of a tenure decision, this purpose is served by our third requirement—that plaintiff be considered for and denied tenure. In *Huang v. College of the Holy Cross, supra,* the court

rejected a contention similar to that raised by defendant here, reasoning that a tenured position does not generally "open up" as would a position in business or industry. We agree.

**4.** The amendments to the Civil Rights Act of 1964 extending Title VII's coverage to educational institutions such as Muhlenberg College were not effective until March 24, 1972. Acts occurring before that date cannot be the basis for liability on the part of Muhlenberg College.

of Fact No. 19) In view of the remarks made by Dean Secor concerning the uncertain future of the Physical Education Department, we conclude that this procedural irregularity may have severely prejudiced consideration of plaintiff's promotion. Even more serious is the "egregious oversight" in December, 1972 when Dean Secor mistakenly failed to forward Mrs. Kunda's name to the FPPC with the names of others to be considered for promotion. (Finding of Fact No. 21) By the time the FPPC was able to vote to recommend Mrs. Kunda, the Board of Trustees had already voted on the promotions of other faculty members. These irregularities cast suspicion upon the decisions not to award plaintiff promotion or tenure.

Finally, plaintiff buttresses her case by comparing her treatment with that accorded to males in her department. Any comparison of this kind is, of necessity, flawed—especially where the absolute numbers of employees in the Physical Education Department is so minimal. Nevertheless, we believe that such comparisons may be extremely useful, first, in determining if plaintiff in fact was treated differently than male colleagues, and second, in determining if such disparate treatment was inadvertent or the result of discriminatory intent. *International Brotherhood of Teamsters v. United States, supra* 431 U.S. at n. 15, 97 S.Ct. 1843.

Ronald Lauchnor, a member of the Physical Education Department who was hired after plaintiff, was promoted in 1971–72 to the position of Assistant Professor although he did not have a masters degree and had completely abandoned any plans to obtain one several years prior to promotion. Mr. Lauchnor was promoted in the 1971–72 school year—the same year Mrs. Kunda was initially denied a promotion. (Findings of Fact Nos. 42–44)

Sam Beidleman, another member of the Physical Education Department, was pro-moted to the rank of Assistant Professor in 1969 contingent upon his receiving a masters degree later that summer. However, Mr. Beidleman had been specifically informed during a meeting initiated by Dean Secor, that a masters degree was a prerequisite to promotion and tenure. (Findings of Fact Nos. 46–47) Similarly, Ronald Lauchnor was advised during a meeting initiated by Dean Secor that it was important for him to obtain a masters degree by the time he was considered for tenure. (Finding of Fact No. 44) By contrast, Mrs. Kunda was never advised that a masters degree was an absolute prerequisite to an award of tenure, even through she initiated several meetings with Dean Secor and President Morey to discuss her future at Muhlenberg. (Findings of Fact Nos. 15, 20, 49)

Finally, there was other male members of the Physical Education Department, Professors Whispell and Flamish, who had been awarded tenure in spite of the fact that they did not possess a masters degree. (Findings of Fact Nos. 41, 53) Since both of these men obtained tenure in the mid-1960's, before President Morey's administration, their treatment perhaps cannot form the basis for a valid comparison with the treatment accorded to plaintiff. Nevertheless, the fact that they were granted tenure is important because of its impact upon the plaintiff's expectations. She believed that it was not necessary for her to possess a masters degree in order to obtain tenure, and in view of the tenure decisions with regard to Professors Whispell and Flamish, and in the absence of information to the contrary, Mrs. Kunda's belief was reasonable. (Finding of Fact No. 50)

### b. Rebutting the Prima Facie Case

Under a theory of disparate treatment, once a plaintiff has established a prima facie case, the burden shifts to the defendants to articulate a legitimate, nondiscrimi-

---

*Hazelwood School District v. United States,* 433 U.S. 299, 309–10, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). However, evidence of such acts may be relevant for other purposes. In this case, we believe that facts relating to the treat-ment of plaintiff and male faculty members prior to March 24, 1972, are relevant on the issue of discriminatory intent. *Id.* at n. 15, 97 S.Ct. 2736.

natory basis for the employment decision in question. *Furnco Construction Corp. v. Waters, supra; McDonnell Douglas Corp. v. Green, supra.* In this case, the legitimate nondiscriminatory reason advanced by defendants is the plaintiff's lack of a terminal degree.[5]

■ Possession of a terminal degree is one of three alternative preconditions for promotion and tenure listed in the Muhlenberg College Handbook. Defendants presented considerable testimony concerning the importance of a terminal degree within the college community. Possession of the terminal degree by faculty members is important both because of the additional contribution that a faculty member with such degree may make to the college community and because of the necessity that a college, in order to command respect within the academic community, maintain high academic standards within its faculty. We accept this testimony and conclude that the terminal degree, taken by itself, constitutes a legitimate, nondiscriminatory requirement for tenure and promotion which is justified by the needs of an academic institution. (Finding of Fact No. 52)

■ However, our inquiry does not stop here. Plaintiffs now have the opportunity to show that the defendant's stated reason for refusing to promote or award tenure to plaintiff was pretextual. *McDonnell Douglas v. Green,* 411 U.S. at 804, 93 S.Ct. 1817. We believe that, with respect to plaintiff's claim of discrimination in promotion, such a showing has in fact been made. One way of demonstrating pretext is to show that the allegedly nondiscriminatory criterion was not applied evenhandedly with respect to all employees. *See id.* at

804–05, 93 S.Ct. 1817. The evidence in this case demonstrates that promotions were not granted solely to those persons who possessed terminal degrees. (Finding of Fact No. 53) In fact, during the time period when plaintiff was under consideration for promotion, a male member of the Physical Education Department, Ronald Lauchnor, was promoted even though he did not possess a terminal degree. Furthermore, as stated above, there were several substantial procedural irregularities in the consideration of plaintiff's bid for promotion. All of these circumstances lead us to the conclusion that Mrs. Kunda was denied a promotion on the basis of sex and that the nondiscriminatory reason proffered by the College is merely pretextual.

■ On the other hand, with regard to tenure decisions, we conclude that the terminal degree requirement was applied evenhandedly and in a nondiscriminatory manner. Since 1970, no faculty member at Muhlenberg has been granted tenure who did not possess a terminal degree. Therefore, plaintiff has failed to show that the application of the terminal degree requirement was pretextual with respect to tenure. (Finding of Fact Nos. 54–56)

■ Even though the denial of tenure in itself was not sex-based, we believe that plaintiff was treated differently than male faculty members in that she was never counselled that the failure to obtain a masters degree would preclude her from being considered for tenure. (Finding of Fact No. 50) Under the circumstances, plaintiff reasonably believed that a masters degree was not an exclusive requirement for tenure and that she could qualify for tenure by

---

**5.** Defendants also argue that the application of the "three-year rule" precluded granting tenure to plaintiff. For several reasons, we cannot give credence to the contention that plaintiff was properly denied tenure because of the operation of this rule. First of all, the Board of Trustees retained the power to grant tenure notwithstanding the "three-year rule". (Finding of Fact No. 6) Second, there was substantial divergence of opinion concerning the proper interpretation of the Rule. (Finding of Fact No. 5) More importantly, however, plaintiff's

name was in fact submitted for tenure consideration, and serious, thorough consideration was given to plaintiff's tenure bid by the FPPC, the FBA, the Board of Trustees, and others. If noncompliance with the "three-year rule" in itself disqualified a tenure applicant, we do not believe that so many people would have devoted so much time to considering plaintiff's qualifications for tenure. If we were to accept defendant's argument, we would in effect be finding, in the case of Mrs. Kunda, that the entire tenure consideration process was a charade.

meeting one or both of the alternative criteria listed in the Faculty Handbook. In fact, as we have seen, the terminal degree requirement was applied uniformly and exclusively in all tenure decisions after 1970. Plaintiff argues that this difference in treatment constitutes a violation of Title VII.

 It is not enough for plaintiff merely to show disparate treatment, however; she must also show that this disparate treatment was not the result of mere inadvertence, but instead constituted purposeful discrimination on the basis of sex. *See International Brotherhood of Teamsters v. United States, supra* 431 U.S. at n. 15, 97 S.Ct. 1843. We have considered this question carefully and conclude, on the basis of several factors, that the disparate treatment accorded to plaintiff was motivated by discriminatory animus based upon sex. (Finding of Fact No. 51) First, plaintiff initiated a number of discussions with Dean Secor and President Morey concerning her future at Muhlenberg and, although the opportunity was clearly present, neither man told plaintiff that her failure to obtain a masters degree would be a barrier to her advancement. Second, Dean Secor and President Morey knew or should have known that members of the Physical Education Department might reasonably believe that a masters degree was not necessary in view of the treatment of Professors Whispell and Flamish. In point of fact, Dean Secor's memorandum of June 26, 1973, which recorded his meeting with Ronald Lauchnor, demonstrates an awareness of this potential problem.[6]

Finally, with respect to Dean Secor, statistical evidence was presented which strongly suggested that, in the areas of tenure recommendations, his decisions were related to a candidate's sex. *See* Exhibit P–303. This evidence is relevant to a finding of discriminatory motive in the failure to adequately counsel plaintiff concerning the importance of obtaining a masters de-gree. It was Dean Secor who took it upon himself to inform Messrs. Beidleman and Lauchnor of the necessity of obtaining a masters degree, while failing to impart the same information to plaintiff. Therefore, it is Dean Secor's intent which is important here. Evidence that, in other contexts, Dean Secor improperly used sex as a criterion is certainly relevant to show discriminatory intent in his failure adequately to counsel plaintiff.

Defendants have given no convincing reason for their failure to inform Mrs. Kunda of the necessity of obtaining a masters degree. We conclude that the disparate treatment accorded Mrs. Kunda with respect to counselling constitutes purposeful discrimination on the basis of sex. We further find that if Mrs. Kunda had been adequately counselled, she would have made every effort to obtain a masters degree. (Finding of Fact No. 50)

II. *Disparate Impact Theory*

 Plaintiff also has alleged that the application of the terminal degree requirement had a disparate impact upon women. As mentioned above, where plaintiff alleges that a facially neutral requirement has a disparate impact, a prima facie showing may be made on the basis of statistics alone. *Dothart v. Rawlinson, supra; Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co., supra.* If a significant statistical pattern is shown, the burden shifts to the defendant to demonstrate that the given requirement bears "a manifest relationship to the employment in question." *Griggs v. Duke Power Co., supra* 401 U.S. at 432, 91 S.Ct. at 854.

 Plaintiff presented evidence of the percentage of advanced degrees awarded to women from 1972 through 1975. These figures demonstrated that, on a nationwide basis, the proportion of females awarded a given degree declines as the degree becomes more advanced. *See* Exhibit P–303. On

---

**6.** The memo states, with reference to statements made by Dean Secor to Mr. Lauchnor, "Told him fact that Whispell and Flamish had got tenure with M.A. would *not* necessarily help his situation." (Exhibit No. 106) (emphasis in original).

the basis of this evidence, plaintiff contends that the terminal degree requirement has a disparate impact upon females.

Assuming *arguendo* that plaintiff has made a prima facie showing of disparate impact,[7] we believe that defendant has successfully rebutted this showing. The evidence submitted by defendant convincingly demonstrates that the terminal degree requirement is closely related to the duties of a faculty member and serves a legitimate need in an educational institution. (Finding of Fact No. 52)

III. *Relief*

◼◼◼ Section 706(g) of Title VII, 42 U.S.C. § 2000e–5(g),[8] provides a panoply of remedies that a district court may invoke where unlawful employment discrimination has been established, thus providing the court with the flexibility to devise a remedy to suit the violation. By granting to the district court wide latitude in fashioning remedies for employment discrimination, Congress intended that this discretion be used "to further transcendent legislative purposes." *Albemarle Paper Co. v. Moody,* supra at 405, 95 S.Ct. 2362. One such purpose is to make whole persons who have suffered injury on account of unlawful employment discrimination. *Id.* As the cases have made clear, the remedies set forth in section 706(g) are not mandatory, but are to be used by the district court in its discretion in an attempt to secure complete justice to injured parties. *See Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).

◼◼◼ In providing an adequate remedy for plaintiff, we believe that the critical inquiry is to determine the position plaintiff would have been in had she not suffered the unlawful discrimination proven here. *Franks v. Bowman Transportation Co., supra* at 764, 96 S.Ct. 1251. We believe that the purposes of Title VII will be adequately served only by answering this inquiry based upon all of the circumstances and then using our equitable powers to the extent necessary to make plaintiff whole. It is clear that "federal courts are empowered to fashion such relief as the particular circumstances of a case may require to effect restitution, making whole insofar as possible the victims of . . . discrimination." *Franks v. Bowman Transportation Co., supra* at 764, 96 S.Ct. at 1264.

We find here that plaintiff was discriminated against on the basis of sex when she was denied a promotion. She was initially considered for and denied promotion during the 1971–72 school year. However, these acts occurred prior to the effective date of the 1972 Amendments to Title VII and, even if we were to find that the denial was a product of sex discrimination, we would be powerless to create a remedy. *Hazel-*

7. Defendants have challenged the adequacy of plaintiff's statistical evidence to make a prima facie showing of disparate impact. In view of our disposition of this issue, we believe that it is unnecessary to consider defendant's arguments.

8. Section 706(g) provides:

(g) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e–3(a) of this title.

42 U.S.C. § 2000e–5(g).

*wood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). Plaintiff was also considered for and denied a promotion the following year. Absent discrimination on the basis of sex, plaintiff would have been granted a promotion during the 1972–73 school year, effective September 1, 1973. Therefore, the appropriate relief for purposes of making plaintiff whole is to grant her a promotion to the position of Assistant Professor effective September 1, 1973.

We also find that the denial of an award of tenure to plaintiff was not based upon her sex, but rather was the result of the application of the sex-neutral terminal degree requirement. Therefore, we are not empowered to award plaintiff tenure. *See Teamsters v. United States, supra.*

Finally, we find that defendant intentionally discriminated against plaintiff on the basis of sex in failing to adequately counsel her concerning the necessity of obtaining a masters degree in order to be awarded tenure. Dean Secor and President Morey had ample opportunity to so inform Mrs. Kunda, especially during meetings with her in the late Spring of 1972 after promotion was initially denied. Had Mrs. Kunda been counselled in the same manner as male members of the Physical Education Department, we find that she would have done everything possible to obtain a masters degree in order to further enhance her chances of obtaining tenure. Although it is

of course impossible for us to know if Mrs. Kunda would have in fact been able to obtain her masters degree, she would have had the *opportunity* to do so. Therefore, in order to make plaintiff whole for the discrimination she suffered, we must somehow restore to her this "lost opportunity" to obtain the masters degree prior to being considered for tenure.

We believe that the only fair way to restore this opportunity to Mrs. Kunda is to provide that she be awarded tenure contingent upon obtaining her masters degree within two full school years.[9] Our calculation is based upon the assumption that if she had been properly counselled by Dean Secor or President Morey in the Spring of 1972, she would have had two full school years—that is, through the summer of 1974 —to obtain her masters degree.[10] Since both Muhlenberg officials had a reasonable opportunity to counsel plaintiff adequately at that time, we believe that Spring, 1972 is an appropriate date upon which to base our calculation. If plaintiff is able to complete the requirements for her masters degree within this time period,[11] then plaintiff should be granted tenure retroactive to September, 1975. This is the date that tenure would have been granted to plaintiff if she had not been subjected to unlawful sex discrimination.

In addition, plaintiff is granted reinstatement with full back pay.[12] The award of

9. The "school year" will commence at the start of the next complete term or semester at the institution where plaintiff enrolls in a masters degree program. We are concerned that it may be difficult for plaintiff to obtain admission into a graduate program at mid-year. If for some reason, plaintiff cannot be admitted to a masters degree program by the start of the next term or semester, the "school year" will not start to run until the beginning of the term or semester immediately following. We believe that this is a fair solution. Had plaintiff been counselled adequately in the Spring of 1972, it is probable that she would have been able to enroll in a masters degree program in the Fall of 1972 with little problem.

10. Plaintiff was considered for tenure during the 1973–74 school year. However, had plaintiff obtained her masters degree by the end of the summer of 1974, she would have been fully

qualified for tenure when her appeal was considered by the FBA and the Board of Trustees during the 1974–75 school year.

11. We recognize that unforeseen circumstances may make it difficult or impossible for Mrs. Kunda to meet the deadline we have imposed. We are confident that Muhlenberg College will act in complete good faith to deal with any unforeseen problems arising from the operation of our Order. The parties may, of course, petition for modification of our Order if that becomes necessary.

12. Plaintiff is entitled to back pay from September 1, 1975 through May 10, 1978, less amounts earned during that time period. Included within the back pay award are amounts representing fringe benefits which plaintiff would have received had she continued at Muh-

these remedies is premised upon the assumption that plaintiff would have been granted tenure but for defendant's discriminatory acts. We are mindful that, even if plaintiff had been adequately counselled, she may not have been able to obtain a masters degree, nor, as a consequence, obtain tenure. However, it is due to defendant's discriminatory acts that we are forced to make such conjectures. We conclude that to deny plaintiff reinstatement and back pay would penalize plaintiff for defendant's actions and deprive plaintiff of a full and complete remedy for her discrimination.

In sum, we grant to plaintiff (1) reinstatement; (2) back pay, from the date of termination less amounts earned in the interim; (3) promotion to rank of Assistant Professor effective September, 1973; and (4) the opportunity to complete or substantially complete the requirements of a masters degree within two full school years of this Order and, if the masters degree is successfully achieved, an award of tenure effective September, 1975.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter of this action pursuant to § 706 of the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e *et seq.* (Supp. V), *amending* Civil Rights Act of 1964.

2. Defendant Muhlenberg College is an "employer" within the meaning of that term as defined in 42 U.S.C. §§ 2000e and 2000e–1 (Supp. V).

3. This court has jurisdiction over the parties.

4. Plaintiff has proven by a preponderance of the evidence that defendant Muhlenberg College discriminated against plaintiff on the basis of sex by failing to promote plaintiff to the rank of Assistant Professor, in violation of Title VII of the Civil Rights Act of 1964 *as amended.*

5. Plaintiff presented a prima facie case of discrimination in defendant's failure to grant tenure to plaintiff. However, defendant has rebutted by a preponderance of the evidence plaintiff's prima facie case, of discrimination in the failure to grant tenure.

6. Defendant has articulated a legitimate, non-discriminatory, job-related reason for the failure to grant tenure to plaintiff—plaintiff's lack of a masters degree. Plaintiff was unable to show that the use of the terminal degree criterion for tenure was pretextual.

7. Plaintiff has proven by a preponderance of the evidence that she was subjected to different terms and conditions of employment because of her sex, in that she received different counselling concerning the requirements for promotion than that received by males in her Department. Plaintiff has proven that this difference in treatment was the result of purposeful discrimination on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964, *as amended.*

8. Plaintiff has not shown by a preponderance that the application of the terminal degree requirement has a disparate impact upon women. The terminal degree requirement is closely related to the duties of a faculty member and serves a legitimate purpose in an educational institution.

## ORDER

NOW, October 19, 1978, in accordance with the accompanying Findings of Fact, Discussion and Conclusions of Law, following a non-jury trial, IT IS ORDERED that judgment is entered in favor of plaintiff Connie Rae Kunda and against defendant Muhlenberg College. IT IS FURTHER ORDERED that the following relief be granted:

lenberg, including (1) payments under Muhlenberg's College tuition plan, equal to one year of tuition for plaintiff's son, and (2) reimbursement for amounts paid into the College insurance plan, which plaintiff continued to contrib-

ute to following the termination of her employment. We request that plaintiff's counsel submit to us a proposed order containing a computation of the amounts of back pay due.

1. That plaintiff forthwith be reinstated to her employment in the Physical Education Department of Muhlenberg College.

2. That plaintiff be granted a promotion to the rank of Assistant Professor, such promotion to be effective from September 1, 1973.

3. That plaintiff be granted back pay, including amounts representing fringe benefits, from September 1, 1975 through May 10, 1978, less amounts earned during that time period; counsel for plaintiff is hereby ORDERED to submit a proposed Order containing a computation of the amounts of back pay due.

4. That plaintiff be permitted the opportunity to complete the requirements for a masters degree within two full school years of the date of this Order (as defined in footnote 9 of the accompanying Findings of Fact, Discussion and Conclusions of Law) and, upon successful achievement of the masters degree, be awarded tenure effective September 1, 1975.

5. That the reinstatement of plaintiff's employment pursuant to this Order shall not constitute "reappointment" within the meaning of the Bylaws of Muhlenberg College such as would, *de facto*, confer continuous tenure, and that such reinstatement shall, with respect to plaintiff's obtaining tenure, be subject to the condition subsequent that plaintiff comply with the requirements of this Order and obtain the Master's Degree within the time provided herein.

This Court shall retain jurisdiction over this action for purposes of enforcement of this Order.